### THE TRANSFER NO. 21.

(Circuit Court of Appeals, Second Circuit. December 11, 1917.)

#### No. 6.

1. SHIPPING ⊂⊃209(2)—PROCEEDINGS FOR LIMITATION OF LIABILITY—SURRENDER OF OFFENDING VESSEL.

The petition in proceedings for limitation of liability is required to surrender only the vessel or vessels in fault, and as a vessel without motive power in tow alongside a tug cannot be in fault for a collision, the surrender of the tug, or the giving of a stipulation for its value, is all that is required, although both are owned by the petitioner.

2. COLLISION ⊂⊃9—NAVIGATION RULES—LOCAL CUSTOM.

The established custom for vessels navigating the channel between Ward's Island and the Astoria shore on a flood tide to keep to the left-hand side of the channel and pass starboard to starboard, owing to the peculiarities of the locality, is a reasonable one, and is not in violation

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of article 25 of the Inland Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 101. [Comp. St. 1916, § 7899]), which require steam vessels to keep to the right or starboard side of the fairway in narrow channels "when it is safe and practicable."

3. COLLISION ☞67—NAVIGATION RULES—BEND SIGNALS.
   Inland Rules, art. 18, rule 5 (Comp. St. 1916, §§ 7892), which requires a vessel, when nearing a short bend, where from the height of the banks it cannot be seen from the other side, to give a signal by a long whistle, does not apply to a vessel lying still near a bend.

4. COLLISION ☞71(3)—MOVING AND STATIONARY VESSEL—LOOKOUT.
   The fact that the lookout on a tug, which with her tow was lying still, did not see a small motorboat, which approached in the night, held not a fault which contributed to a collision, where the boat approached from around a point and could not have been seen until 30 seconds before the collision.

5. COLLISION ☞59—MAKE-UP AND SPEED OF TOW.
   There is no obligation on the part of a tow to go, or to be able to go, at any particular speed with reference to other vessels, unless in narrow waters or crowded harbors.

Appeal from the District Court of the United States for the Southern District of New York.

Proceeding in admiralty for limitation of liability by the New York, New Haven & Hartford Railroad Company, owner of Transfer No. 21. Otto Schmuck and others, owners of the motorboat Pilot, appeal from a decree finding Transfer No. 21 without fault for a collision. Affirmed.

Charles M. Sheafe, Jr., of New York City (James T. Kilbreth, of New York City, of counsel), for petitioner.

C. J. Earley, of New York City (Norman B. Beecher, Chauncey I. Clark, and John L. Galey, all of New York City, of counsel), for appellants.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

WARD, Circuit Judge. November 25, 1912, at about 5:40 a. m., the motorboat Pilot, 33 feet long, 9 feet beam, bound east from New York to Long Island Sound on a fishing trip, came into collision with float No. 53 on the port side of Transfer No. 21, which with another float, No. 57, on her starboard side, was proceeding west from Oak Point to Greenville, N. J. The place of collision was near the Astoria shore, just below Hallett's Point. The tide was running strong flood, the wind blowing a gale from the west, and the morning very dark. The motorboat went under the bow, passed out under the stern of the float, and was carried by the tide to the foot of Hoyt avenue, Astoria. The motorboat was a total loss, Otto Schmuck, her owner, sustained personal injuries, and his guests, Joseph F. Willax and W. D. Livingstone, were drowned. Actions at law were begun in the Supreme Court of the state of New York for all these injuries, to recover damages aggregating $112,000.

[1] The New York, New Haven & Hartford Railroad Company, owner of Transfer No. 21, and of the two floats, filed a petition for

limitation of liability and gave a stipulation for the appraised value of Transfer No. 21 in the sum of $65,000, there being no pending freight. Schmuck and the personal representatives of Willax and Livingstone moved that the limited liability proceeding be dismissed, on the ground that the court was without jurisdiction, because the petitioner had not also surrendered or given a stipulation for the value of the two car floats. Judge Lacombe denied the motion, holding that, neither car float being at fault, the petitioner had complied with the statute in giving a stipulation for the value of Transfer No. 21. We agree with him. A tug and tow are for some purposes regarded as a single vessel, as, for example, in connection with the steering and sailing rules; but in this circuit the petitioner in limited liability proceedings is required to surrender only the vessel or vessels at fault. A tow without motive power, alongside a tug and moved by it, cannot be at fault. In the case of The Bordentown (D. C.) 40 Fed. 682, Judge Addison Brown required the claimant to surrender, not only the tug Bordentown, which was in charge of the navigation of the tow and at fault for proceeding in threatening weather, but also the helper tug Winnie, because she supplied part of the motive power and was acting under the orders of the master of the Bordentown. This court, in the subsequent case of The W. G. Mason, 142 Fed. 913, 74 C. C. A. 83, said that, if the decision in The Bordentown was based upon the consideration that the personal liability of the owner was conclusive of the liability of the Winnie in rem, it was erroneous. So in this case the petitioner, as owner of Transfer No. 21, may be in fault, and so liable to her value, but it is not in fault as owner of the floats, because neither of them did or could do anything whatever either to cause or prevent the collision.

[2] This brings us to the question of the merits. The flood tide between Ward's Island and the Astoria shore runs true; that is, straight down the channel, but with an eddy on the Astoria shore below Hallett's Point. It was abundantly proved that vessels going west strike over from Negro Point to the Astoria side of the channel, so as to get the benefit of the eddy in rounding Hallett's Point, while vessels going east keep to the middle of the channel and cross over to the Ward's Island side, coming down near Negro Point, so as not to be carried by the tide onto Scaly Rocks. This is especially true of hawser tows. In other words, vessels meeting going east and west pass starboard to starboard on the flood tide at this point. This is what Transfer No. 21 did, blowing the required bend signal as she crossed over to the Astoria side, but keeping practically stationary about two hours before the collision happened, because she was not able to round Hallett's Point even in that weaker tide. This appears to us a reasonable custom of navigation arising from the peculiarities of this locality. In the case of The E. A. Packer, 58 Fed. 251, 7 C. C. A. 216, and the case of The Josephine B, 58 Fed. 813, 7 C. C. A. 495, relied upon by the appellants, the court held that there was no sufficient proof of custom.

[3] The claimants charge Transfer No. 21 with negligence in not frequently blowing a bend whistle while lying below Hallett's Point

to notify vessels coming from the west that she was there. Inland Rule 5 reads:

"Whenever a steam vessel is nearing a short bend or curve in the channel, where, from the height of the banks or other cause, a steam vessel approaching from the opposite direction cannot be seen for a distance of half a mile, such steam vessel, when she shall have arrived within half a mile of such curve or bend, shall give a signal by one long blast of the steam whistle, which signal shall be answered by a similar blast, given by any approaching steam vessel that may be within hearing. Should such signal be so answered by a steam vessel upon the farther side of such bend, then the usual signals for meeting and passing shall immediately be given and answered; but, if the first alarm signal of such vessel be not answered, she is to consider the channel clear and govern herself accordingly. * * * "

This rule contemplates a vessel continually moving and approaching the bend, which was not the case with Transfer No. 21. If the situation of a vessel lying still near a bend is such as to make a signal prudent, we can only say that Congress has not provided for it by this rule.

The Transfer is also charged with fault for navigating on the wrong side of a narrow channel; that is, on the port side of mid-channel, in violation of article 25 of the Inland Regulations. Assuming that the waters are such as to constitute a narrow channel, article 25 applies only when it is "safe and practicable" to do so. The customary navigation at this point on a flood tide would make compliance with the rule neither safe nor practicable. Vessels going westward on the starboard side of the channel near Ward's Island would meet vessels coming eastward on the rapid tide. Collisions and confusion would inevitably follow. Navigation in accordance with the practice resulting from experience in the particular locality was in our opinion proper.

[4] Transfer No. 21 is next charged with failure to keep a vigilant lookout. It is certainly true that the lookout did not discover the motorboat till the moment of collision, and, if this contributed to the collision, Transfer No. 21 is at fault. The little motorboat was going with the tide at a speed of at least 12 miles an hour, and as she was, according to Schmuck, but 600 feet from the Transfer when she rounded Hallett's Point, the collision happened within 30 seconds. There was then, according to Schmuck, abundant room for the motorboat to pass clear port to port, and he attributes the collision, not to the fact that he did not see the Transfer, but to her suddenly sheering to port. The District Judge disbelieved this story, and we agree with him. The Transfer was not moving over the land, and if the lookout had seen the motorboat 30 seconds before the collision there was nothing she could have done to prevent it. Indeed, the whole of Schmuck's testimony is discredited by the fact that when he testified before the inspectors, about two months after the collision, he located it at a point near the Astoria ferry, more than a quarter of a mile west of Hallett's Point.

[5] Finally, the petitioner is charged with fault for letting the Transfer take so heavy a tow that she could not make headway against the flood tide at Hallett's Point. We know of no obligation upon the part of tows to go at any particular speed with reference to other ves-

sels. If the conditions of business make it expedient to take tows so heavy that progress can be made only on favoring tides, there is no reason we know of to forbid it. Indeed, this is true of much of the hawser towing in Long Island Sound. A different question would arise in case of a claim against a tug for damage sustained by her tow, or if damage were done by the tug and tow to other vessels in narrow waters or crowded harbors.

The decree is affirmed.