## THE O'BRIEN BROS.

### (District Court, E. D. New York. May 3, 1918.)

1. SHIPPING ⬿209(2)—LIMITATION OF LIABILITY.

   Where a tug, towing scows, ran down a motorboat, the scows, being innocent instruments and in control of the tug, need not be surrendered with the tug in order for the owner of that vessel to obtain a limitation of his liability.

2. SHIPPING ⬿209(3)—LIMITATION OF LIABILITY—DENIAL OF ANY LIABILITY.

   In a proceeding to limit liability to the value of the vessel causing the injury, etc., liability may be denied in toto and that question litigated.

3. COLLISION ⬿71(2)—LIABILITY—VESSELS AT FAULT.

   A tug in charge of scows, which ran down a motorboat that had temporarily anchored because of engine trouble, held solely at fault; it appearing the motorboat had duly lighted its lights, and that the tug was proceeding without care in waters where the presence of small vessels might be expected.

4. COLLISION ⬿75—LIGHTS—SUFFICIENCY.

   Where the aft light of a motorboat, temporarily anchored because of engine trouble, was sufficient to comply with Act June 9, 1910, § 3a, and the stern of such boat was toward a tug which ran her down, the sufficiency of the motorboat's bow and side lights is immaterial.

5. COLLISION ⬿75—LIABILITY—LIGHTS.

   The pilot rules as to anchored vessels (Act Aug. 19, 1890, § 1, art. 11 [Comp. St. 1916, § 7849]), relating to lights, are applicable to a boat lying at anchor not expecting to move, and not to a vessel drifting with a small anchor dragging, but only for the purpose of retarding her progress and keeping her from going ashore while repairs are being made to her engine.

In Admiralty. In the matter of the libel and petition of O'Brien Bros., Incorporated, owners of the steam tug O'Brien Bros., etc., for limitation of liability. Petition granted limiting liability to the value of the tug.

Foley & Martin, of New York City, for petitioners.

Uterhart & Graham and Charles A. Ludlow, all of New York City, for damage claimants.

Harrington, Bigham & Englar, of New York City, for the Zita.

CHATFIELD, District Judge. This is a petition to limit liability, filed by the owner of the tug O'Brien Bros., which was surrendered in order to stay the prosecution of two claims for death and three other actions for injuries or loss of property, occasioned by a collision between the motorboat Zita and a scow, in Hempstead Harbor, on the evening of the 28th of July, 1916. In the limitation proceedings, opposition was made to the granting of the limitation because the owner of the tug did not surrender the value of the scow which struck the motorboat, and of the two other scows in the tow. The proceedings resulted in the production of a fund amounting to $15,045 by the sale of the tug alone. The application to dismiss the proceeding for failure to include the scows was denied. In re Transfer No. 21, Otto Schmuck et al., C. C. A., 2d Circuit, Dec. 11, 1917, 248 Fed. 459, —— C. C. A. ——.

The following claims were filed in the limitation proceedings, viz.:

George A. Leyare, as administrator of the estate of Emma E. Leyare,
   deceased (damages for death)..............................$50,000.00
William Graham (personal injuries)............................ 2,000.00
Addison L. G. Price (personal injuries)....................... 3,000.00
Lewis A. Howell, as administrator of the estate of Lucy N. Howell,
   deceased (damages for death)............................... 15,230.00.
George A. Leyare (damage to motorboat Zita)................... 275.00

The action was tried in June, 1917, and at the close of the trial the following findings were made:

The facts which the court will find, and which do not raise a serious conflict between most of the witnesses, are substantially as follows:

The Zita on the day in question had been lying off Bar Beach in Hempstead Harbor, anchored by a heavy anchor to her bow. After supper six people came on board, and the bow anchor was slipped and left with its cable attached to a buoy. The Zita proceeded either beyond or around the point of Bar Beach, so that when engine trouble left her drifting she went with the tide to the southward; that is, toward Roslyn, and in the channel. She drifted several hundred feet, because she was definitely located at least as far south as the power house, and probably opposite the southerly end of the power house, before any one particularly noticed her position.

There is no question that Mr. Leyare, the owner, and Mr. Price were in the galley, which is under the forward deck, and that Mr. Howell and Mr. Graham were sitting in wicker chairs facing forward in the cockpit under the awning, which extended from the 3-foot stern deck about 10 feet forward. The other 17 feet of the boat was decked over clear to the bow with mahogany decking, and there were portholes forward of the cockpit, in the mahogany siding of the decked-over portion.

There is no question that Mrs. Leyare and Mrs. Howell were in the cockpit, and that all four persons in the cockpit of the boat were paying attention to those fixing the engine, and estimating whether the engine would be repaired, so that the boat could start, before a tow which had appeared around Bar Beach to the north should reach them, when coming up the channel. All of the persons upon the boat noticed this tow, and the men repairing the engine were endeavoring to get it to work, because all of the persons knew that the boat was anchored in the channel, and their purpose was to get out of the way. The anchor, which weighed 12 pounds, was probably insufficient to hold the boat against the tide without some drag. It ran from a line fastened to the cleat upon the small stern deck. The set of the tide opposite the power house, down to what is called the T wharf, representing a distance along the shore of 170 feet, is somewhat toward the T wharf, although it is substantially directly up the channel toward Roslyn. A boat swinging from an anchor would lie either parallel to the shore or slightly toward the wharf.

The anchor in question had been put overboard at Mr. Leyare's suggestion, and, according to the testimony of the various witnesses, had been on the bottom about 10 minutes when the accident occurred.

A Mr. Salters and his wife and a Mr. Lane were walking up the hill toward the north and east, back of the power house. They were looking directly toward the west side of the harbor, over which, according to their testimony, the sun had just set. They reached a point where the motorboat was visible somewhere opposite the so-called T wharf, as seen by them on a line over the northern end of the T wharf. When they saw the tow coming from behind the power house they watched it (except while it was behind a shed) pass over this distance of 170 feet. A Miss Bauer and her brother, who were at a camp on the bank or shore 211 feet further south, saw the motorboat just before they went in to supper, and saw it again just before the accident. They saw it over, or out from, the southerly end of the T wharf. All of the witnesses in the case agree that the open water between the boat and the wharf was approximately a boat length, that is, 30 to 35 feet; and all of the witnesses in the case who testified as to the movements

of the boats show that the motorboat moved further out, or to the west, just before being struck. Mr. Graham testified very carefully, and, from the standpoint of his position in the cockpit of the boat, seems to have stated the facts in a way that accords with that of every other witness, so far as the situation and movements of the boats are concerned. He agrees with the other witnesses that just before the accident Mr. Leyare ran out and up on the stern deck of the boat. Graham had just before this, and at Mr. Leyare's suggestion, been getting in the anchor. He states that he stood upon the seat in the back of the cockpit until the anchor came in, so that he lifted it over into the cockpit; that then Mr. Leyare went by him, and that he turned to help Mrs. Leyare up on the stern, as evidently the stern of the boat was to the east or inshore of the point where the barge was then plainly going to strike. The motions of all the parties show that they went toward the stern to avoid the scow.

Mr. Price, upon coming out of the cabin, attempted to give the others life-preservers, and, as he immediately followed Mr. Leyare, and had time to hand life-preservers to but three persons, it can be seen that the time elapsing was but a few seconds. Mr. Howell and his wife moved over to the south side—that is, away from the scow—which evidently was the port side of the motorboat, when the blow occurred. There is no question that Mr. Leyare, Mr. Howell, Mr. Graham, and Mr. Price went overboard to the south, or over the port side of the launch, just as the scow struck the launch.

There seems to be no question that the two women never got out from under the awning, and that the awning was immediately forced under water. The boat either rolled over or went clear under, and then righted herself, with the awning hanging over on the port side, and with the body of Mrs. Leyare, at least, in the awning under water, so that it floated off with the awning when Capt. Bouchard shoved the awning away from the boat. Capt. Bouchard's testimony is definite as to the position of the boat and the way in which the awning was put over after the accident. It corresponds exactly with the testimony of all the other witnesses as to the position of the boat and its movements. He contradicts them only in placing the anchor from the bow of the boat, and in stating that he saw a man run out on the bow deck and pull on the anchor. There is no question that Mr. Leyare did run out. He had been tinkering with the engine with a portable electric light, and the man that Capt. Bouchard saw had a light, and was probably Mr. Leyare. The anchor was being pulled in at the time, and I see no reason to question that Capt. Bouchard is mistaken, in the momentary glimpse which he had of the boat, in stating that the anchor ran from the bow of the boat. The movement of the boat was very plainly up the channel toward the anchor, so far as the anchor had power to hold it against the tide, and the boat, very evidently, according to the testimony of all the witnesses, was sucked around and across the bow of the scow as it was pulled up to the anchor, coming across the front end of the scow, with the bow of the launch toward the west. The motion of the boat forward, that is, toward the west, which several of the witnesses observed, was after Mr. Graham had lifted the anchor, and after the suction of the barge moved the boat, as seen by Mr. Bauer, suddenly from the position which it had been occupying.

The mark upon the port side of the boat, and the facts that Capt. Bouchard did not discover Mrs. Leyare's body, that the awning was clear over in the water, and that neither of the women escaped, would indicate that the boat may have turned completely over after Capt. Bouchard turned off the search-light, because I think that there is no question that the momentary flash seen by Mr. Van Cott may have been this flash of the searchlight, and that Capt. Bouchard's movements in throwing the searchlight upon the boat and immediately starting to go to the assistance of the boat, and apparently the almost simultaneous movement of the motorboat out of the sight of the Gallagher, or out of the range of the searchlight of the Gallagher by going behind the O'Brien Bros. and the scow, would explain why those upon the motorboat did not notice the searchlight. Capt. Bouchard's glimpse of the man pulling in the anchor, followed immediately by the boat's moving bow

forward, confused him as to which end of the boat had the line to the anchor,. which must, just at that moment, have been lifted inboard.

I think that these facts show that there is no falsification of testimony, no subsantial disagreement of the witnesses. The O'Brien Bros. was evidently passing up the channel, at a distance, measured from her keel, of about 35 or 40 feet from the face of the dock. 'Whether she could have cleared the motorboat, if it had not been drifting and if the anchor had held, is immaterial, because the distance would have been too slight to make the position of either boat safe. Therefore we have the O'Brien Bros. passing up the channel substantially on a line which would bring her either against or' in collision with the motorboat, and with two scows upon the O'Brien Bros.' starboard hand, and a third scow still over to the westward, or starboard, of the two which were alongside.

The soundings which have been taken, and also the hydrographer's chart which is in evidence, make it plain that there was water enough at half tide for the O'Brien Bros. to pass up safely within 30 feet of the pier, and that on that course the O'Brien Bros. could hold substantially a straight course from the turn at Bar Beach until she reached the narrow point some 1,000 feet further to the south of the point of accident.

The survey shows that this water is deep enough for the O'Brien or the Gallagher, and extends from that point to the west, a varying distance, but that at half tide the barges could safely go over the low points or the edge of the bar, and that it was the custom of the boats to tow in the form indicated, and for the tug to assume the position indicated, because of the depth of the water. The surveys of the chart show that the 6-foot contour works toward the east till it is (at a point between the power house and the T dock) 160 or 170 feet from the face of the dock, while the 12-foot contour opposite the power house has worked eastward to a point 90 feet from the face of the dock. Opposite the shed the 12-foot contour disappears, as the greatest depth is less than 12 feet and at the T dock an 11-foot contour line would have worked over to the east to within 90 feet of the dock.

This shows the general trend of the bottom, and shows why · the deep channel, that is, mid-channel, as used by the tug, would be straight down on a line parallel to the easterly shore. It shows that the O'Brien Bros. was not far from the middle of the deep water course up to the point of accident, while the motorboat was anchored in the channel just to the east of the middle of the deep water course, prior to the accident; but evidently the suction of the boats passing would have drawn her into collision if she had remained at anchor.

That is about as far as I care to find the facts. I might add that the testimony seems to show definitely that there were lights in the cabin of the motorboat. The witnesses upon the shore were looking at the stern of the boat and· saw these lights. They saw lights through the portholes when the boat was evidently broadside to them, and before it swung the stern toward ' them. This was the light with which the men were seeking to find the engine trouble. The evidence seems to show that a lantern, at Mr. Leyare's suggestion, had been hung under the awning at the stern, in such a situation that it would be directly obscured by Mr. Graham if he were hauling in the anchor, and the persons in the motorboat were in such a position that they would obscure the light from the companionway to any person approximately on a level with the boat, while those up on the hill might have seen the light over the heads of those on board.

There is no question that, as viewed by those looking toward the west and into the glow of the setting sun, the boat would be plainly visible; and there is no question that (as the tug was coming up the channel toward the hill, and navigating neither by lights nor by ranges, but by general familiarity with the shore line and the shape of the objects toward which it was heading) the motorboat would be in the shadow. The hull of the boat would be visible with difficulty, and there seems to be no question in the case that the lookouts, the captain of the O'Brien Bros. and the captain of the Gallagher, which was following behind the O'Brien Bros., failed to see any light on the motorboat till after the O'Brien Bros. had sounded the alarm, and until Mr.

Leyare or Mr. Price had run out from the cabin with the portable light in their hands.

[1] The above findings narrow the case to substantially simple issues. The total amount of recovery must necessarily be limited by the value of the tug, which alone was responsible for the movements of the entire fleet. The barges were innocent instruments in the accident, and a limitation proceeding cannot include their value. Particularly is this so as it appears that the captains of the scows were attending to their duties, and there is no evidence of negligence on their part. The Sunbeam, 195 Fed. 468, 115 C. C. A. 370.

[2] While a petition to limit liability would primarily presuppose some liability to be limited, the language of the statute and the decisions thereunder have made it plain that the petitioner has the right to contest the sufficiency of the claims in the same way and to the same extent as if the actions were being tried in admiralty, upon pleadings originally filed in this court.

[3] The O'Brien Bros. was using the channel upon the night in question in the customary manner. Her draft was such that at certain points in the channel she could not get through before the tide had risen to some extent. By the time the O'Brien Bros. could get through, there would be water enough over the flats, so that the empty scows could be safely towed on one side of the tug, even though the outer scow should pass over the edge of the flats in so doing. A tow made up in this fashion would thus appear to avoid completely blocking the channel, while if the scows were towed on both sides of the tug, and the tug navigated in the middle of the channel, any boat attempting to pass to starboard would be driven up on the mud flats, and any boat attempting to pass to port would be driven on shore.

But, if boats could not pass safely to port, the tug, which herself needed the depth of water in mid-channel, or even somewhat closer than the center to the shore, would be negligent under the narrow channel rule, and liable for any damage occasioned to a craft which might be met, and which did not voluntarily run ashore or stop until the tow could slow down and the boats maneuver past each other.

Evidently, in order to avoid this liability, the tows used the one-side method of towing, and, as has been said, the whole tow, as it came toward the shore below the power house, worked over beyond the middle line. There was still water space enough between the tug and the dock for the Zita, or any of the power boats which ordinarily navigated that harbor, to pass on the port side of the channel, if under way. The channel was not a locality where boats were ordinarily found anchored. The statute forbids anchoring in a channel, but a boat compelled by emergency to anchor, or to lie in a navigable channel, is entitled to all the protection which the rules of navigation and the admiralty law can give, if she herself is obeying the laws as to lights, signals, and alarms.

The testimony in this case indicates that the Zita had her anchor out purely from necessity, and the mere fact of being anchored had nothing to do with causing the collision. It is evident that the Zita had a light, and that this was sufficient to give notice of her presence,

unless it was obscured by the bodies of some of those in the boat, or by some portion of the awning. But the lookouts on the O'Brien Bros. did not see the Zita until they made her out as a dark object in their path. She must have then been very close to the O'Brien Bros., and the suction of the tow, coupled with the movement of the Zita toward her anchor, as this was raised, brought the boats so close together that the accident could not be avoided.

Evidently the lookouts on the O'Brien Bros. had no thought of meeting a helpless or drifting boat, and it may be that they paid no attention to the Zita's light, as it seemed to be sufficiently over near shore to pass the O'Brien Bros. safely, if on a boat which could control its own movements.

It was negligence for a tow of the size of the O'Brien Bros. to occupy the greater part of the navigable channel, and to proceed at such a rate of speed that the tug was unable to stop the tow when danger arose to a boat lying in its own half of the channel. The position in which the Zita lay indicates that just at that point the O'Brien Bros. was using considerably more than half of the channel, and certainly her care and watchfulness should have increased under those circumstances, so as not to do damage to any of the craft that might get in the way.

It is impossible to hold that the parties upon the Zita, who continued trying frantically to get the engine to working, in order to get out of the way, and who then rushed for life-preservers and to save the women, can be charged with negligence because the Zita, in being pulled up to her anchor, moved closer to the O'Brien Bros., or because the Zita's lights were temporarily obscured by their movements. If the contention of the O'Brien Bros., that the men on the Zita were so terrified that they all jumped overboard as the scow struck the Zita, is correct, it would not prove negligence on the part of the Zita. The Gallagher, which was following the O'Brien Bros.,· used her searchlight as soon as she heard a signal from the O'Brien Bros. indicating that there was any trouble. If this was necessary, it would seem that the darkness must have been sufficient to make a strong presumption of negligence against the O'Brien Bros., when a boat was run down within the waters of its own side of the channel, bearing a light and lying at anchor until just before the collision.

[4, 5] The Zita's light aft was sufficient, under the provisions of chapter 268 of the Laws of 1910, § 3 (a), first, 36 Stat. 462 (Comp. St. 1916, § 8279), as the Zita's stern was toward the tug and her red and green side lights and bow light had nothing to do with the situation. The pilot rules as to anchored vessels being article 11 of chapter 802, § 1, Act Aug. 19, 1890, 26 Stat. 324 (Comp. St. 1916, § 7849), require an anchored vessel to carry forward a white light showing clearly around the horizon for the distance of at least a mile. This law is applicable to a boat lying at anchor and not expecting to move from her position. The Zita was drifting, with a small anchor dragging, but only for the purpose of retarding her progress and keeping her from going ashore while repairs were being made to the engine. She was a stationary, but nevertheless navigating, vessel, sub-

stantially out of control, and not an anchored vessel, so far as her signals were concerned.

If the darkness was so great that there was danger in using the channel, the boat with the searchlight should have proceeded, or the speed should have been reduced so that the tug could easily control her scows, for this channel was not a passage where navigation was constantly expected and met, and which small boats would be expected to avoid. It was a channel infrequently used at night, which had been dredged for the passage of cargo boats. But they should be required to use the greatest care in taking up substantially the whole of that channel at those points where they were under the shadow of the hills, and where the channel passed immediately along the shore, with no escape for a boat that could not manage her own movements, and where the suction from large tows would affect the entire body of the water in the channel.

A decree should be entered granting the petition to limit liability to the value of the tug, and giving judgment to the damage claimants for such amounts as may be found on further hearing.