### THE HOKENDAUQUA.*

### THE HENRY STEERS.

(District Court, D. C. New York. January 29, 1919.)

1. **Collision** ⟜90—**Channel between Throgg's Neck and Willet's Point "narrow channel."**
    The channel between Throgg's Neck and Willet's Point *held* a "narrow channel," within the meaning of Inland Rules, art. 25 (Comp. St. § 7899).
    [Ed. Note.—For other definitions, see Words and Phrases, Second Series, Narrow Channel.]

2. **Collision** ⟜90—**Navigating use determines whether passage is narrow channel.**
    It is not the mere physical dimensions of strait or passage of water that determines whether or not it shall be called a narrow channel, within Inland Rules, art. 25 (Comp. St. § 7899), but it is the kind or character of navigating use to which that water is put.

3. **Collision** ⟜91—**Custom held not to justify violation of rule.**
    A custom of vessels passing eastward through the channel between Throgg's Neck and Willet's Point to keep to the port side of the channel *held* not justifiable, and not to afford any valid excuse for violation of the starboard side rule.

4. **Collision** ⟜95 (1)—**Violation of rules by meeting tow held sole cause.**
    A collision between meeting tows at the eastern end of the channel between Throgg's Neck and Willet's Point, *held* due solely to the fault of the east-bound tug in keeping to the wrong side of the channel.

In Admiralty. Suits for collision by Anthony O'Boyle and by John Hildebrandt against the tug Hokendauqua, with the tug Henry Steers impleaded, and by the James McWilliams Blue Line against the Henry Steers, with the Hokendauqua impleaded. Decrees against the Hokendauqua.

Macklin, Brown, Purdy & Van Wyck, of New York City, for libelant.

Herbert Green, of New York City, for claimant of the Hokendauqua.

Park & Mattison, of New York City (Samuel Park, of New York City, of counsel), for claimant of the Henry Steers.

HOUGH, Circuit Judge. There is little, if any, difference of opinion among the witnesses as to the leading facts in this case. The

---

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Decree affirmed 270 Fed. 273.

Hokendauqua made up her tow, went across the stream or river to get within hail of the naval patrol boat, and deliberately went to the north or port side of the channel between Throgg's Neck and Willet's Point, in order by that path to emerge into the open Sound. In order to follow the channel, or at least the ordinary course, so as to pass Stepping Stones Light to starboard and Execution Light to port (going eastward), it was necessary for the Hokendauqua to swing somewhat sharply around the buoy at Throgg's Neck under a starboard helm. All vessels must do this in order to pursue the common course of navigation. There can be no excuse for pursuing such a method of navigation, except a custom that responds to the tests laid down by law in respect of a violation of rule.

[1] It is said that the channel between Throgg's Neck and Willet's Point is a narrow channel within the Inland Rules. I am of opinion that it is, not because it is of any definite width, or measures any particular number of yards across, but because it is a body of water, so much used and used in such a manner as to render the application of article 25 (Comp. St. § 7899) both proper and necessary. It was pointed out in The No. 4, 161 Fed. at page 850, 88 C. C. A. at page 668 that "channels within the rule are bodies of water navigated up and down in opposite directions." The inference there drawn was that harbor waters, where the necessities of commerce require navigation in every conceivable direction "up and down and across," cannot be considered narrow channels. In The Three Brothers, 170 Fed. at page 50, 95 C. C. A. at page 324, it was said that the rule under consideration is—

"not an inflexible rule to be followed in all cases, and, where it is manifest that a blind adherence will produce disaster, it is not only the right, but the duty, of the navigator to disregard it. The rule so states explicitly. It must be followed only [in the language of the rule itself] 'when it is safe and practicable.' "

[2] It is therefore not the mere physical dimensions of a strait or passage of water that determines whether it shall be called a narrow channel or not. It is the kind or character of navigating use to which that water is put. Judged in this manner, the strait in question is most emphatically a narrow channel. It is the eastern outlet of New York Harbor. It carries an extensive commerce, which, with the exception of such trivial ferry business as may exist between the Westchester and Long Island shores, is all bound either into the harbor or out from the harbor. Furthermore, its eastern or outward boundary is, for the navigating purposes of vessels of any size, a sharp bend—a place where most east-bound vessels must starboard, and all west-bound vessels must port, in order to get to the best water for their business.

[3] The tide is not unduly strong, even at its topmost strength, barely more than a knot, and no reason appears to me why a variation from the rule should be recognized as a valid custom. Everything that makes for the recognized habit of east-bound vessels going through Hell Gate taking the Ward's Island side of the channel (The Transfer No. 21, 248 Fed. 462, 160 C. C. A. 469) makes against the custom here insisted upon, and the reasoning of the Benjamin Franklin, 145

Féd. 13, 76 C. C. A. 43, is entirely applicable. In point of fact, I consider it proven that this "custom" of tows that leave Hammond's Flats bound east to hug the Throgg's Neck buoy is one devised for their own convenience, not based on any necessity of navigation, distinctly not tending to safety, and by no means universal. It is therefore for every reason bad.

[4] That this erroneous navigation on the part of the Hokendauqua was the prime cause of the disaster is, I think, beyond doubt. It remains to consider whether the Steers was not also guilty of contributing fault. The two tugs saw each other's lights, I believe, at least a half a mile apart. Such, at all events, is the evidence, and, however deceptive estimates of distance over the water and at night time are, it is plain that there were no conditions of haze or fog that should have prevented good lights being seen at this distance, and there is no accusation in respect of the lights of any vessel concerned. Both tugs were in charge of their pilots. Both captains were off watch. If it be necessary to draw any comparison between the apparent intelligence and education of the two navigators, I should unhesitatingly prefer the pilot of the Steers, assuming good intent on the part of both men as witnesses. I find that the Steers, pursuing the channel course and intending, according to his understanding, and correct understanding, of the law, to keep to the starboard side of the channel, saw the lights of the Hokendauqua on his starboard bow at the estimated distance of a half a mile; but, since the buoy at Throgg's Neck was not visible in the nighttime, he could not tell how far away she was from that buoy or the not very adjacent shore. He navigated on the assumption that the east-bound Hokendauqua would take the starboard side of the channel as she went out into the Sound. As, in my opinion, he was justified in this assumption, it follows that he was justified in swinging around the buoy, or where he thought the buoy was, just as he did. That he made a good calculation is shown by the uncontradicted evidence from the tow of the Steers that the barges passed with the buoy plainly in sight a few feet on their starboard side.

It would be possible to enter into some minute calculations as to whether or not the pilot of the Steers might not have inferred a long tow on a long hawser behind the tug that turned out to be the Hokendauqua and have permitted himself to come into too close proximity with such a tow. I do not think that any such computations can be made with accuracy, and if it be true (as I believe and find) that the course and the intended course of the Hokendauqua was a plain violation of the statute, and the course undoubtedly taken by the Steers was a compliance with the statute, the fundamental reasons for the occurrence are apparent and are all unfavorable to the Hokendauqua. Therefore upon most familiar principles it is not necessary, and indeed is not permitted, to the court to search for minute possible faults on the part of one vessel when the great and fundamental faults are plainly to be laid at the door of the other.

For these reasons, all of the libels above enumerated will be dismissed with costs as to the Steers, and sustained with costs as to the Hokendauqua. In those cases in which the Steers has been impleaded, and not originally sued, the petitioning party will pay the costs of the Steers