## THE LEXINGTON.

### THE TRANSFER NO. 15.

District Court, S. D. New York.
Aug. 8, 1934.

Duncan & Mount, of New York City (Henry W. Dieck, Jr., and Charles R. Millett, both of New York City, of counsel), for New York, N. H. & H. R. Co.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Frederic Conger, both of New York City, of counsel), for the Lexington.

418

KNOX, District Judge.

At a few minutes past 6 o'clock on the morning of February 7, 1929, and close by the float bridges of the New York, New Haven & Hartford Railroad Company, at Oak Point, Bronx Borough, New York City, the steamer Lexington collided with libelant's car float No. 54, in tow of the tug Transfer No. 15. The contact damaged both the car float and the steamer. In addition, another car float, lying at the bridges, was injured when the Transfer's tow, under the force of the collision, was thrown against it.

The Lexington was libeled by the owners of the No. 54. That suit was followed by a cross-action against Transfer No. 15 by Colonial Navigation Company, owner of the Lexington. At the time of the accident, the darkness of the night still held, and rain was falling. It was accompanied by a light north-northeast wind. Nevertheless, visibility was good for one and one-half miles. A tide of about two knots was running to the eastward. The Transfer No. 15, with two loaded steel car floats, was on her way from Jersey City to libelant's terminal at Oak Point. The floats were each 357 feet in length, and projected about 200 feet ahead of the tug's bow, one on each side.

The Lexington, a passenger and freight steamer, 246 feet long, 46 feet beam, and of 1,248 gross tons burden, was bound from Providence, R. I., to her Manhattan pier.

As told by the persons on board Transfer No. 15, and her tow, the tug and her barges, as they approached North Brothers Island, passed a municipal ferryboat, following a signal of two whistles. In passing, the Transfer's engines were stopped. When the ferryboat was safely by, the Transfer again started forward with the intention of proceeding to a point off Tiffany street, where the flotilla was to turn and approach libelant's float bridges against the tide. As the Transfer, near midchannel, was about to reach the northerly end of North Brothers Island, the Lexington was seen approaching from the east, somewhat to starboard of the center line of the channel. She was showing her red light, and the starboard lamp of the Transfer was visible to the steamer. In other words, so far as concerns navigation lights, the vessels were on crossing courses. Apparently, the Lexington picked up the light of the Transfer at about the same moment that the Transfer sighted the steamer. The distance between the vessels at this time is variously estimated at from four or five hundred to twenty-one hundred feet. Owing to darkness of the morning and the frailities of human recollection, these estimates are of little reliability.

But, be these matters as they were, the Transfer blew the Lexington a passing signal of two blasts. She received an immediate and similar reply. Following the exchange of whistles, the Transfer undertook to navigate so as to pass between the Lexington and the Bronx shore. The master of the Transfer, following the exchange of signals, not observing any alteration of the Lexington's course, realized that his desired maneuver could not safely be executed, and started backing, hooked up. This was not sufficient to avoid collision.

At a distance of between 100 and 200 feet off the float bridges, the Lexington's bow struck car float No. 54, lashed to the starboard side of the Transfer, some 60 feet astern of the float's bow.

The Lexington's version of the occurrence, while not differing greatly from that of the Transfer, should be stated. It is that she came by Hunt's Point at 5:58 at half speed, or at the rate of seven miles per hour. She had expected to pass through the channel between North and South Brothers Islands. But, upon coming close to it, her master saw an east-bound tow in the passageway and shaped his course so as to come down the broader channel between the northerly side of North Brothers Island and the Bronx shore. The width of this channel is close to 1,100 feet. As the Lexington proceeded, she sighted a ferryboat (doubtless the one that had passed the Transfer and her tow) rounding the green light at the northerly end of North Brothers Island. With an exchange of one-blast signals the two vessels passed port to port. In going by, the Lexington put her rudder a bit to port. When straightened up, she was some 200 feet off the Bronx shore. At this moment, the Transfer and her tow were seen approaching about two points on the Lexington's port bow. When the Transfer was from 400 to 700 feet away, she blew two blasts, asking permission to cross the Lexington's bow and to pass starboard to starboard. The Lexington, on giving two blasts of her whistle in response, wished to indicate her intention to co-operate in carrying out the Transfer's request. Appreciating that what was about to be undertaken was a dangerous maneuver, the master of the steamer ordered her helm "hard astarboard," and an instant later directed the engines to be put full speed astern. Both orders were executed. Simultaneously, with the latter order, the Lexington blew

three blasts on her whistle to inform the Transfer that she was backing. She twice repeated this signal. Within a minute or so, the Transfer, having continued to come ahead, and notwithstanding that the Lexington was all but stopped, a collision occurred at a point from two to three hundred feet from the float bridges.

At this stage of my recital of the evidence, it should be said that no issue is involved as to the failure of either vessel to have a proper lookout. The reason the vessels did not see each other before they were so close together is that the vision of each was obstructed by the hospital buildings near the shore of the island. It is agreed also that a flood tide; such as was running at the time of accident, sets strongly on the Bronx shore.

This latter fact constitutes the chief basis of the Transfer's claim for exoneration. Contention is made that, due to the tidal condition, it is customary for heavy vessels and tows, when meeting in these waters, to pass starboard to starboard and to disregard the requirements of articles 19 and 22 of the Inland Rules (33 USCA §§ 204, 207). To support this alleged practice, the owner of the Transfer No. 15 produced the testimony of a number of tugboat captains, in addition to that of the master of Transfer No. 15. Not only is it said that the evidence of these witnesses establishes the custom, but that its existence has been recognized and approved by the Court of Appeals for this circuit in The C. Gallagher, 262 F. 97, 99.

By way of opposition to libelant's proof upon this phase of the case, the Lexington offered substantial and persuasive evidence from experienced mariners that no such custom exists. Without attempting to analyze the testimony given by the several witnesses, it is enough to say that the oral proof tending to establish the existence of the alleged custom does not preponderate. Hence, the case cited by libelant must be examined to see if the custom has been judicially declared. In the case of The C. Gallagher, the navigation of three hawser tows was under review. One of them had a length of 600 feet. Another had four sand scows in tandem formation. The third was made up of a tow of five boats in two tiers. Two tows were bound east, and the third was approaching from the opposite direction. Their difficulties ensued somewhat to the north and east of North Brothers Island. In deciding the issue there raised, Judge Ward said: "We think the Spartan (the tow of 600 feet in length) was solely at fault. Article 25 requires steamers to keep the starboard side of a narrow channel 'when it is safe and practicable.' The testimony is quite convincing that hawser tows west bound, in approaching North Brothers Island on a flood tide navigate on the port side of the channel in order to give east bound hawser tows room to round North Brothers Island and pass the railroad piers on the north side in safety. The flood tide in the main channel sets on Oak Bluff and the New York side opposite the northern end of North Brothers Island, and is then deflected slightly toward Riker's Island; this set being somewhat counteracted by the direction of the weaker tide coming through the shallow channel between North Brothers Island and South Brothers Island. We regard this as a reasonable practice, justifying a departure from the general rule described in article 25 and have recognized similar practices at other points. The Three Brothers, 170 F. 48, 95 C. C. A. 322; The Transfer No. 21, 248 F. 459, 160 C. C. A. 469." (Italics mine.)

From this, it will be seen that the custom sustained by the decision was limited to hawser tows. Furthermore, the facts are easily distinguishable from those now before the court. Here the Transfer was bound across and not along the channel. When the vessels first sighted each other, they were in close quarters, and her master knew that the vessels could not possibly pass unless the Lexington quickly co-operated in the maneuver she was requested to make. He knew also that the Lexington's swing to port would be retarded by the flood tide. Moving under slow speed, as she was, her rudder response necessarily would be sluggish. Inability to get out of the way of the Transfer was a foregone conclusion from the outset. Under all these circumstances, it is difficult to see a sound reason for holding her at fault. Even though it be assumed that passing vessels are entitled in these waters to disregard the rules, the custom which the Transfer pleads by way of justification for her course of action should not be held to apply to vessels on crossing courses. The Lexington certainly was lawfully positioned when the Transfer came in sight. The flood tide was operating on the steamer with the same force that bore down upon the Transfer, and the latter, in my opinion, had no business to request the Lexington to do the impossible. She should have held back and allowed the Lexington to cross her bow. The fault, if any, of the Lexington, is to be found in her assent to the Transfer's request. But here I think the steamer should be treated with tolerance. She was not per-

mitted under the rules to cross the Transfer's signals. Had she done so and held her course, a collision would have been inevitable. Perhaps it would have been better had she sounded an alarm. But her failure so to do should not inflict liability upon her. She was in for trouble any way she acted. Confronted with danger, as her master was, and having the safety of passengers in his keeping, I think his conduct in trying to avoid the results of the action demanded by the Transfer is not open to just criticism. It was designed to do all that reasonably could be done to escape the ill effects of a situation which the Lexington did not create, and to which she did not affirmatively contribute.

⸰ The libel on behalf of Transfer No. 15 is dismissed, and that in the cross-suit is sustained.