## THE CLARA McGEENEY.

## THE McALLISTER BROTHERS.

### McGEENEY v. DANIEL McALLISTER CORPORATION et al.

District Court, S. D. New York.
Nov. 10, 1938.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for libelant.

Purdy, Mason & Lamb, of New York City (John E. Purdy and Gerard M. McAllister, both of New York City, of counsel), for claimant.

Duncan & Mount, of New York City (H. W. Dieck and C. R. Millett, both of New York City, of counsel), for respondents.

LEIBELL, District Judge.

The owner of the deck scow "Clara McGeeney" filed a libel against the tug "McAllister Brothers", of which the Daniel McAllister Corporation is the owner and claimant and against the tug "Transfer No. 11" of which the respondents, trustees of the New York, New Haven and Hartford Railroad Company are the owners. Later the libel was amended to include certain appropriate allegations in respect to the reorganization proceedings involving the respondent railroad. On the trial of the action it was conceded that the railroad tug was the Transfer No. 12 —not No. 11.

The claim of the libellant is for damages sustained by the scow, while it was in tow of the tug "McAllister Brothers", in a collision between the scow and a carfloat in tow of the "Transfer No. 12". The collision occurred at 3:30 in the morning of October 25, 1936, in the East River near Hallet's Point. The weather at the time of the collision was clear. There was little wind and what there was came from the starboard side of the McAllister tow. The tide was flood, about 2½ hours gone, and was running through Hell Gate at about 2 to 2½ miles per hour. The McAllister and its tow had come up the East River on the westerly side of Blackwell's Island and was bound eastward through Hell Gate for Riker's Island and had a tow of three scows loaded with ashes for the dump at Riker's Island. The tow was made up with two scows in the head tier, the "Clara McGeeney" being the starboard scow and the "Raymond Cleary" the port scow. Astern of the "Clara McGeeney" was the scow "Margaret McCullough". The tow was on two hawsers from the tug McAllister, of about 100 feet each, and was made up in the usual fashion.

The railroad tug, "Transfer No. 12", was bound westward, from Oak Point near North Brothers Island, through Hell Gate and had two carfloats, lashed one on each side of the tug.

There is a sharp conflict in the testimony as to the whistles that were blown by the respective tugs and as to the place of collision. In the early part of the trial there was an issue as to whether the libellant scow "Clara McGeeney", had lights properly posted, but before the case was half over this issue was eliminated. The captain of the "Transfer No. 12" admitted that he saw the McAllister tow and that the question of its lights had nothing to do with the collision.

There was proof that as a result of the collision the scow "Clara McGeeney" was damaged, so the issue to be decided is which of the respondents was at fault or whether both were at fault. I am of

the opinion that the fault lies with the tug McAllister Brothers and that the Transfer No. 12 was in no respect at fault and that therefore the libel should be sustained as to the tug McAllister Brothers and dismissed in respect to the Transfer No. 12.

The proper course to be followed in navigating through Hell Gate on a flood tide, between Ward's Island and the Astoria shore, has been decided in two leading cases in this circuit. In the case of The Transfer No. 21, 2 Cir., 248 F. 459, 461, decided some twenty years ago, Judge Ward wrote: "This brings us to the question of the merits. The flood tide between Ward's Island and the Astoria shore runs true; that is, straight down the channel, but with an eddy on the Astoria shore below Hallett's Point. It was abundantly proved that vessels going west strike over from Negro Point to the Astoria side of the channel, so as to get the benefit of the eddy in rounding Hallett's Point, while vessels going east keep to the middle of the channel and cross over to the Ward's Island side, coming down near Negro Point, so as not to be carried by the tide onto Scaly Rocks. This is especially true of hawser tows. In other words, vessels meeting going east and west pass starboard to starboard on the flood tide at this point. This is what Transfer No. 21 did, blowing the required bend signal as she crossed over to the Astoria side, but keeping practically stationary about two. hours before the collision happened, because she was not able to round Hallett's Point even in that weaker tide. This appears to us a reasonable custom of navigation arising from the peculiarities of this locality. In the case of The E. A. Packer, 58 F. 251, 7 C.C.A. 216, and the case of The Josephine B, 58 F. 813, 7 C.C.A. 495, relied upon by the appellants, the court held that there was no sufficient proof of custom."

Recently, in the case of Tar & Fuel Transport Corporation v. Palmer, 2 Cir., 90 F.2d 437, Judge Learned Hand wrote: "The collision occurred just west of the Triborough Bridge in Hell Gate. The tide was flood, full strength, and there was much ice in the river. Both boats were navigating in accordance with the custom in Hell Gate on the flood, which we accepted as proper in The Transfer No. 21, 248 F. 459, and which requires a west bound vessel to leave the right hand side of the channel at Negro Point, to cross the tide and to make for Hallett's Point, getting the benefit of an eddy which makes into Pot Cove. She must then cross the tide again, and get back to the right side of the channel, about opposite the Astoria Ferry. Conversely, an east bound vessel must cross the tide to reach the left side of the channel between Mill Rock and Hallett's Point, and make for Negro Point, which she must keep close aboard as she passes, for otherwise the tide coming in between Hog Back and Mill Rock and making strong towards the Astoria shore will carry her over on to the Scaly Rocks."

In respect to the issue as to where the collision occurred, I find that the starboard bow corner of libellant's scow came in contact with the port bow corner of carfloat No. 3 (the port side float of the Transfer No. 12) at a point about 275 feet off the steel pier and 600 feet east of Hallet's Light, in the vicinity of the Astoria shore. This is the point of collision testified to by the witnesses called by the Transfer No. 12. The McAllister contended and produced witnesses to testify that the collision took place on the Ward's Island side of the Hell Gate channel, between Ward's Island and Astoria, at a point about 250 feet off Hog Back Light. The McAllister's contention is not supported by the probabilities of the case. There was no reason why the Transfer No. 12 with her floats should voluntarily follow a course that would take her in the vicinity of Hog Back Light. Such a course would be contrary to the usual practice in navigating Hell Gate in a flood tide and would also compel the Transfer No. 12 with her floats to face the full force of the flood tide, right at the point where the current from the Harlem River passes to the northeast of Mill Rock and meets the tide coming up the East River on the Manhattan side as it swings east of Mill Rock on its way through Hell Gate. The McAllister's attorneys, realizing the improbability of the Transfer's captain voluntarily taking any such course near Mill Rock advance the theory that the Transfer No. 12 had been in the ebb eddy in Pot Cove and that as it came out towards the steel pier on the Astoria side, it was caught by the tide and carried over towards Hog .Back and into collision at that point. An examination of Exhibit D in this case, a chart of flood current observations in the East River, New York, Hell Gate, prepared by the Engineering Corps of the United States

Army, indicates no such current direction. If the Transfer No. 12 had been in the ebb eddy at Pot Cove, she would have had to cross the tide in order to get over to the point near Hog Back where the McAllister contends the collision took place.

I find that the course followed by the Transfer No. 12 was from a point just north of Negro Point, southwest across Hell Gate to a point just west of Pot Cove, from which she proceeded in the direction of Hallet's Light, Astoria, and then drifted back several hundred feet while her engines were stopped or in reverse in an effort to avoid the collision. With respect to the McAllister I find that the course she followed was from a point in the westerly channel of the East River between Blackwell's Island and the Manhattan shore, off 86th Street, favoring the Blackwell's Island side of the channel, that she was carried by the tide over towards Hallet's Point on the Astoria shore and came into collision about 300 feet off the Astoria shore at a point about 600 feet east of Hallet's Point Light.

The McAllister was a tug of 250 horse power. She had the flood tide under foot and since she favored the Blackwell's Island side too much she was caught in the currents as indicated on Exhibit D. She was carried in the direction of the Astoria side and Hallet's Point Light. The McAllister was actually trying to straighten out her tow at the time the collision took place. Apparently the McAllister lost control of her tow, because at the time of the collision the tow was drifting towards the Transfer No. 12's floats and the starboard hawser of the McAllister tow was slack.

There is a conflict in the testimony as to the signals that were blown, but both sides are in agreement that there were starboard passing signals. The McAllister contends that it blew one long bend signal before it neared Hell Gate when it was opposite the light at the northeasterly end of Blackwell's Island and that later when it sighted the Transfer No. 12 it blew two whistles. At that time it is claimed that the McAllister was at a point about 250 feet southeast of the southerly light at Mill Rock. It is contended by McAllister that at the time she first observed Transfer No. 12, the Transfer No. 12 was just under the Triborough Bridge off Negro Point on Ward's Island. (See Exhibit A.) The testimony of the barge captain of the "Clara McGeeney"

does not support this statement as to the position of the McAllister when these whistles were blown. (See Exhibit 1.) He stated that the one long whistle was blown by the McAllister when she was southeast of Mill Rock and the two whistles were blown by the McAllister when she was at a point indicated, which is almost half way between Mill Rock and Hog Back. This barge captain did testify however that when he came on deck after he felt the jar of the collision, Hallet's Point Light, Astoria, was about 300 feet away, that he saw three lights at the time, the Hallet's Point Light, the Alligator Light (Mill Rock) and the Hog Back Light, and that his boat was then closest to the Hallet's Point Light. He estimated that he was about 400 feet from the Hog Back Light and 1000 feet from Negro Point. Of course, he could not have been 400 feet from the Hog Back Light and also 300 feet from Hallet's Point Light. But his testimony is clear that he was closest to Hallet's Point Light on the Astoria shore. This sustains the contention of the Transfer No. 12 that the collision took place near the Astoria shore and not near Hog Back.

In respect to the bend signals, the captain of the McAllister testified that he blew one when he was just off the light at the northerly end of Blackwell's Island. The captain of Transfer No. 12 testified that he blew a bend signal when he was just above Negro Point. According to the testimony, neither captain heard the other captain's bend whistle, but there is no doubt about the fact that when Transfer No. 12 blew two whistles for the starboard passing the McAllister answered with two whistles. At the time the Transfer No. 12 blew a bend signal it was not in any position to see the McAllister. As a matter of fact the Transfer No. 12 did not see the McAllister until the Transfer No. 12 was at a point about 300 feet northeast of Hallet's Point Light. At that time the McAllister was in the channel between East 86th Street, Manhattan, and the north end of Blackwell's Island, favoring the Blackwell's Island side. The McAllister was the privileged vessel with the tide under foot and was entitled to the right of way when sighted by Transfer No. 12 and Transfer No. 12 gave the McAllister the right of way and held back in a position east of Hallet's Point Light. If the McAllister had not favored the

Blackwell's Island side too much and had not been caught in the current that sweeps over towards Hallet's Point she would have been able to, follow the usual course for east bound vessels through the Gate and kept on the side of Mill Rock and Hog Back. According to Exhibit D the currents on the Manhattan side of the channel off 86th Street, would have carried the McAllister past Mill Rock and over towards Hog Back, which is the course that she should have followed going east through Hell Gate on the flood tide.

The McAllister was clearly at fault in bringing her tow, Clara McGeeney, over on the wrong side of the Hell Gate channel and causing it to collide with the port carfloat of the Transfer No. 12. The navigation of the Transfer No. 12 was in no respect faulty. In trying to back away and avoid the collision one of the carfloats of the Transfer No. 12 bumped the steel pier. This is further proof of the fact that the collision took place close to the Astoria shore. The length of the car floats was 245 feet.

The libel is sustained against the tug "McAllister Brothers" and dismissed as to the tug "Transfer No. 12". A special commissioner will be named to report on the damages sustained by the scow "Clara McGeeney". Submit decree accordingly.