## THE CORNELL.

(District Court, S. D. New York.  January 7, 1905.)

1. COLLISION—VIOLATION OF RULES—CONDITIONS JUSTIFYING TOWS IN PASSING TO THE LEFT.

The passing of two tugs with large tows on hawsers starboard to starboard when meeting in the Hudson river below Poughkeepsie bridge, *held* not a violation of article 18, rule 1, of the statute governing river navigation (Act June 7, 1897, c. 4, 30 Stat. 100 [U. S. Comp. St. 1901, p. 2881]), it being shown that such had been the custom since the bridge was built, and was necessary to enable the up-bound tow to properly approach the bridge to pass through the center span safely.

2. SAME—TOWS—INEVITABLE ACCIDENT.

A collision between vessels forming a part of two large and long tows when passing each other in Hudson river *held* not due to a violation of the navigation rules by the tugs in passing starboard to starboard, nor to any fault of the tugs, but to inevitable accident, the tows having been driven together by a sudden and severe windstorm when they were passing at a proper and usually safe distance.

In Admiralty.  Suit to recover from tug for damage to tow by collision.

Hyland & Zabriskie, Charles M. Hough, and Nelson Zabriskie, for libellant.

Amos Van Etten, for claimant.

ADAMS, District Judge. This action was brought by George W. Carman, Jr., the owner of a canal boat of the same name, to recover from the steam tug Cornell, the damages caused to the canal boat by collision on the 26th of May, 1904, with loaded boats in tow, on a hawser, of the tug George W. Washburn, a Cornell tug, bound down the river. The Carman was the outer starboard boat in the 4th tier of a flotilla of eight tiers of light boats, being towed by the Cornell, on a hawser about 600 feet long, from New York up the river to Athens. The whole tow was about 1,700 feet long. When the vicinity of the Poughkeepsie Bridge was reached, the Carman, which projected somewhat beyond the sides of the other boats, was brought sharply into contact with one of the Washburn's starboard boats and severely injured. Some other boats were broken loose from the tows by the collision.

The collision occurred a little after 3 o'clock in the afternoon. Up to about that time the weather was clear. The tide was ebb. There was a two masted schooner in the Cornell's tow, in the 2nd tier ahead of the Carman, and some ice boats.

The tug is charged with fault in passing on the starboard instead of the port side of the other tow. The defence is that the tows were passing in the customary manner at this place and that the accident was an inevitable one, because caused by a sudden and severe storm from the westward, which blew the Cornell's tow over to the eastward and in contact with the other tow. The libellant urges that there was no sudden storm, which could not have been anticipated and provided against, and that even if it should be found that there was such a storm as the claimant contends for, that the tug must still be held, because when the storm came on, the Cornell was violating her statutory duty and under such circumstances, the violation and not the storm must be regarded as the proximate cause of the collision.

The testimony, in addition to the facts stated above, shows that the Washburn's tow, also a long one, about 1,500 feet in length, was proceeding at the rate of about 3½ to 4 miles an hour. The Cornell and tow were going at the rate of about 4 miles an hour. When below Blue Point, a projection from the western shore of the river, about two miles below the bridge which crosses the river just above Poughkeepsie, the Washburn and the tow were seen by those on the Cornell and tow a little above, or about coming down under the bridge. The Cornell manœuvred in accordance with the usual custom to get her tow straightened out to pass through the center or cantilever span of the bridge, which is the largest of the five spans which it contains. This span is 518 feet wide in the clear between the abutments, and 165 feet above the surface of the river at low tide. On each side is what is called a Truss Span, about 500 feet wide and 132 feet above the water. The other two spans are cantilever spans of about the same height as the first mentioned. Not much attention was paid in the testimony to the western span, probably because it is not regarded as available for navigation. Although there is a sufficient depth of water there, the width is much reduced by the fact that the span extends for a considerable space over land. The eastern span is also reduced in navigable water space in the same way and the navigation

of what remains is rendered more or less difficult by structures towards and on the land. With a masted vessel in tow, the center cantilever span is the one ordinarily used by towing vessels and for large tows generally.

It appears that since the bridge was built, about 18 years ago, it has been the habit of tows to pass at this point on the starboard side of each other, instead of on the port side, as the navigation laws ordinarily require. It is provided:

"Art. 18. Rule I. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other."

   *       *       *       *       *       *       *       *

"Art. 25. In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of such vessel."

Act June 7, 1897, c. 4, 30 Stat. 100, 101 [U. S. Comp. St. 1901, pp. 2881, 2883].

The practice of the Cornell tugs of going to the starboard side has not evidently arisen from any intention to violate the rules but because it is incidental to what is regarded as the safest and most practicable method of overcoming the difficulties of passing under the bridge with long tows. When such a tow is going up the river, in order to pass safely through the center span, it is necessary to straighten the tow out before the bridge is reached. This involves the down coming tow going to the left, as going to the right would probably, on account of the conformation of the river, involve both in unnecessary difficulties.

The tows pursued the usual course upon this occasion. When they were about half way between Blue Point and the bridge and opposite each other, a sudden storm of wind arose, with rain and hail, blowing the tail of the Cornell's tow over against that of the Washburn and doing considerable damage. The storm lasted for a few minutes only, but there can be no doubt upon the testimony as to its suddenness and severity. Of course, if the Cornell was in fault for going to the left instead of to the right of the other tow, the storm, no matter how severe and sudden it may have been, would not be available as a defence, but where she was proceeding not in violation of law but in conformity with what prudent navigation evidently dictated and had been in successful practice for many years in this particular neighborhood, it can not justly, I think, be said that the storm was not the proximate cause of the accident.

I have not overlooked the libellant's claim that the tug had no lookout, and his absence was the cause of the tug not knowing of the storm's approach. It seems that the storm was so sudden in its approach that no lookout could have seen it in time for the tug to have provided against its effect, even if that could have been anticipated. It has not been suggested, nor does it occur to me, what could have been

done under the circumstances to avert the accident. The tows were passing at a distance variously estimated from 200 to 700 feet. Assuming it was the former, which is the libellant's claim, it was quite sufficient under ordinary circumstances to constitute a prudent margin for that neighborhood.

No navigation signals were given by either tug but that is unimportant because each understood just what the other was intending to do.

Assuming that the tug was justified by the necessities of the bridge navigation in going to the left, the case seems to fall within the authorities holding that where loss is occasioned by a vis major, there can be no recovery of damages. The Morning Light, 2 Wall. 550, 560, 17 L. Ed. 862; Spencer on Marine Collisions, § 195.

Libel dismissed.