## THE HENRY O. BARRETT.

### THE JAMES McCAULLEY et al.

(Circuit Court of Appeals, Third Circuit. May 8, 1908.)

No. 21.

**1. COLLISION—CONFLICTING EVIDENCE—PROPER MANNING OF VESSEL.**

Where there is a conflict of testimony as to whether one or the other of two vessels brought about a collision by negligent navigation, it is proper to consider the manner in which each was manned at the time.

**2. SAME—TOW AND ANCHORED DREDGE—NEGLIGENCE OF TUG.**

A heavily laden schooner being towed down the Delaware river at night on a hawser 80 fathoms long came into collision with a dredge engaged in dredging the new channel, and anchored between that and the old channel. The dredge was properly lighted, indicating that vessels should pass to the eastward through the old channel. There was a direct conflict of evidence as to whether the tug or tow was in fault; the tug claiming that she kept a course directly toward the dredge until within a mile, and then sheered to the eastward, and the schooner, failing to follow, gave her three several signals with her whistle, each time taking a course more to the eastward, until she was headed directly toward the New Jersey shore. The schooner claimed that the tug was on a course to the westward of the dredge until the schooner was within 700 or 800 feet, when she sheered directly across the channel and signaled, and that the schooner at once starboarded her wheel, but was unable to turn in the short distance. *Held* that, taking into consideration that the schooner was fully manned by experienced and competent seamen all of whom were fresh at the time, with a lookout, and that the navigation of the tug was, or at least had been up to immediately before the collision, in charge of an unlicensed deck hand, and that she had no lookout, the story of the schooner was the more probable, and, as it was corroborated to some extent by the watchman on the dredge, the tug would be held solely in fault.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

Theodore M. Etting for American Dredging Company.

Edward F. Pugh and Edward S. Dodge, for schooner Henry D. Barrett.

F. C. Adler and John F. Lewis, for tug James McCaulley.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

BUFFINGTON, Circuit Judge. On April 2, 1903, the schooner Henry O. Barrett, while being towed down the Delaware river by the tug James McCaulley, collided with and injured the anchored dredge Columbia. Thereupon the Columbia libeled the schooner. The schooner under the fifty-ninth rule petitioned to bring in the tug, and filed a libel against the tug and dredge. From both decrees, the Barrett appealed.

That schooner, en route from Philadelphia to Boston, carrying 2,800 tons of coal and drawing 24 feet, was being towed down the Delaware by the tug on an 80-fathom hawser. The time of the collision was shortly after 4 a. m. The night was dark, but lights were plainly visible. The tide was falling; it being about one-third ebb. The dredge was anchored at a point known as "Dan Baker shoals," where she had

been dredging a new channel. This new channel was almost, but not wholly, completed, and the dredge anchored on its eastern, and the old channel's western, side, and displayed a white anchor light and four red danger lights, in accordance with the regulations of December 4, 1905, prescribed by the Secretary of War for the Delaware river, as follows:

"(2) Vessels using the channel shall pass the dredges on the side designated from the dredge by the signals prescribed in paragraph 7 of these regulations." "(7) Dredges shall display by night one white light on a staff in the middle of the dredge and at least thirty (30) feet above the water, to serve as the regulation anchor light, and four (4) red lights suspended in a vertical line from the outer end of the horizontal spar used by day for the suspension of the black ball, the lights to be set on the side of the dredge on which it is desired approaching vessels shall pass."

The dredge displayed another white light forward, but the District Court found, and we concur in that view, such light misled no one, and did not contribute to the accident. We also find the dredge rightly selected the old or eastern channel as the proper one for approaching vessels, and correctly marked that route by four vertical red lights. Being anchored properly, lighted, and without fault, the burden is on a striking vessel to exculpate itself. Consequently the controversy in this case has narrowed to one between the tug and her tow. The tug's explanation of the accident is that, seeing the lights of the dredge some two miles away, she bore down on them until within a mile distant, when she veered to pass to the eastward; that the schooner failed to follow her, whereupon she blew to her; that the schooner still failed to follow, whereupon the tug steered more to the east and blew again; that the schooner still failed to follow, whereupon the tug blew again a second and a third time, sheering off each time more to the east, whereupon the tug sheered off at practically right angles and blew again, but the schooner failed to respond, went straight ahead, and struck the dredge. The story of the schooner is that the tug headed slightly to the westward of the dredge lights until the schooner was about 700 or 800 feet distant from the dredge, when the tug took a sharp sheer to the eastward; that the schooner at once did everything possible to follow, starboarded her wheel, followed at once by hard astarboard; that the first whistle from the tug was when she was making this sheer; that, owing to the shortness of time and distance, the schooner was able to sheer but a little to the east, and struck the dredge through the fault of the tug. There is the usual conflict of testimony, and the ascertainment of the truth lies in a due regard, not only to the proofs, but to all the surrounding facts and circumstances.

The gist of this case lies in this: Whether the tug began her maneuver to the eastward soon enough, and whether the schooner failed to follow her. Now, the mistake of the tug in beginning her sheer, if mistake is shown, was one of misjudgment, while that of the schooner in failing to heed her warnings and follow was one of gross neglect. The question, therefore, is: Does the case point to a mistaken judgment of the tug or a gross disregard of duty by the schooner? In view of this the manning of the two crafts becomes important, for a due regard by a vessel in placing enough and capable men in the place

of duty raises a presumption of vigilance and care in performance, while an insufficient or incompetent manning shows a disregard or indifference to those factors on which the safety of vessels depends. Thus in The Charles L. Jeffrey, 55 Fed. 686, 5 C. C. A. 247, it was said:

"Everything about this vessel indicates a reasonable degree of vigilance; so that the probability that she complied with her duty under the law is prima facie established."

Now, in this case the schooner was fully manned. She was in charge of her mate who carried a master's license for all oceans, and whose oversight of the vessel was unhampered by other duties. She had as lookout a seaman of 11 years' experience. The wheel was in charge of a seaman of 10 years' experience. In addition to these, an extra seaman was on watch, who was not assigned to any particular duty. In view of the presence of these men, of the fact they were all fresh on watch, it does not seem probable that each of them would have lost sight for five minutes of the tug's lights sheering to the eastward, and have also ignored three sets of whistle warnings from her. To make this more probable, it is contended by the tug the schooner mistook the lights on the dredge for those of the tug. This theory of confusion of lights is based on the alleged admission of one man, the mate, but we think such confusion highly improbable, if not, indeed, impossible. The proof is that to the eastward of the white anchor light of the dredge were the four vertical red lights, so unusual a display in position and number that experienced seamen on the schooner admit that, other than indicating danger, they did not know what they meant. It is conceded by all hands the night was such that lights were plainly visible. Taking the dredge's lights for those of the tug would therefore involve the extraordinary fact that the tug had suddenly displayed four red vertical lights. Whatever credence might at first thought be given to the contention that the anchor light of the dredge might have been confounded with the towing light of the tug, it would seem clear that the presence of these four vertical red lights alongside would at once show those on the schooner that the cluster of different colored lights on the dredge were not those of the tug. But a study of the proofs satisfies us that the contention is not even supported by the weight of the proofs. The captain of the tug was asked: "How do you account for the collision, Captain?" and replied, "Why, they in charge of the schooner took the machine's lights for the tug's. There is no other way that I see." He was then asked: "Is that what the mate of the schooner told you he did?" and said: "That is what the mate of the schooner told Mr. Herron, that he had mistaken the dredge's lights for the tug's lights." This was followed by the testimony of Hornung, a deck hand on the tug, who says he heard the talk between the schooner's captain and Herron just after the collision:

"Well, Capt. Herron asked the captain of the schooner, 'What the trouble was, what was the matter, couldn't you see our lights?' and the captain says, 'I don't know nothing about it.' He says: 'I was below, but my mate was on watch'—and he referred to the mate, and the mate says— He didn't say anything, he meandered around, and he said: 'Yes; I took the machine's lights for the towboat's lights.' That is all the mate of the schooner says."

Herron says:

"I asked him [the mate] what he was trying to do. The mate of the schooner said he mistook the lights of the dredge for the tow's lights."

This alleged conversation was utterly denied by the captain and the mate, both of whom, as well as Smith, the lookout, Jorgansen, the wheelman, and Smith, the extra seaman, all testify they saw both the lights of the tug and the cluster of red and white lights on the ·dredge. Moreover, it is not without much significance that this alleged confusion of lights by the schooner was neither averred by the dredge in its libel, though Herron was connected with that company, or by the tug, though the witness Collins was its master. Had these witnesses then understood the mate of the schooner to have made such a statement in the presence ·of her captain, a statement which the tug captain says is the only explanation of the accident, it would naturally have been charged against the schooner in the ·pleadings. Its absence corroborates the testimony of the schooner's witnesses, not only that no such conversation took place, but that the clustered red and white lights on the dredge were seen by the schooner's lookout, and were not confounded with the white lights of the tug. The fact, then, being that the schooner did not mistake the lights but was following the light on the tug, and the testimony of five men on the schooner being that, as soon as the tug changed her course, the schooner's wheel was at once put to starboard, the case resolves itself into the question, at what point did the tug. sheer to the eastward? She says a mile away. The schooner says about 700 or 800 feet. The tug says she whistled at intervals during a gradual and greater series of sheers. The schooner says the whistling was when the tug was making her first and only sheer. At this point the manning of the tug becomes an element. Now, in fact, the tug had ·no lookout, and the wheelsman, whom there is evidence tending to show was standing the mate's watch, was an unlicensed deck hand. It is urged the absence of a lookout is not material, because in point of fact the deck hand, who was at the wheel, saw the dredge's lights in ample time; and that the latter was an unlicensed man is immaterial because the captain himself was on watch, and directing the movement of the tug. But it will be observed it is by no means certain that the captain of the tug, and not the deck hand, was in charge of the watch. The master of the schooner proved the declaration of the tug captain that he had just come on deck. He says that, just after the collision, the tug came up to the schooner, and, being asked about the collision, "I said that I had just come on deck a minute before we struck the dredge, and the captain of the tug says that he had just come on deck too"—a statement which the captain of the tug did not deny when he came on the stand. Of course, if the testimony elsewhere of the tug's captain is true—that he was in charge—the fact that an unlicensed man was at the wheel is of no special significance, but the assumption of responsibility by the captain, while seemingly disengenuous, is in reality self-exculpatory, for it tends to relieve him from a blameworthy course, which up to that time he had been

pursuing that night of having the mate's watch in charge of an unlicensed man. This practice of an unlicensed watch which the captain had been pursuing that night and for a month past was in violation of Rev. St. § 4438 (U. S. Comp. St. 1901, p. 3034), and evidences not only his disregard of due safeguards, but also the necessity of self-exculpatory proof on his part. "The failure to comply with statutory requirements and regulations has frequently received the severest condemnation of the courts, and, when such an omission is clearly established, the presumption is that it did contribute to the collision, unless the contrary is obviously apparent, and this presumption attends every fault connected with the occurrence, and a further obligation is imposed to show, not only that it probably did not so contribute, but that it could not have done so," The Eagle Wing (D. C.) 135 Fed. 832. This self-exculpatory evidence is therefore to be closely scrutinized, for, as was well said by Judge Butler of this circuit in The John H. May (D. C.) 52 Fed. 882:

"These witnesses are interested. Swearing to exculpate themselves. I have yet to meet with an instance of collision where witnesses from the vessel in fault did not testify to a faithful discharge of their duties, and to the faultlessness of their vessel."

And, in any view, the lack of mate and lookout on this tug shows such a disregard of those legal requirements conducive to safety that a corresponding lack of that alert vigilance which a tug controlling the movement of a tow is bound to exercise is a not unlikely sequence. The schooner was of deep draught, was moving with the tide, was liable to be towed into shallower water, and the answer to her helm might be eccentric. The evidence of the wheelman does not show that these factors of uncertainty had due regard by him in determining the start of the tug's sheer. Now, the evidence of the witnesses on both sides shows that a point from a quarter to a half mile from the dredge was a proper distance to begin such sheer. That the captain and mate, without any reason for this departure from the usual course of pilots, agree the tug began its sheer a mile away, rather indicates they are proving too much; and it will be observed that, if such is the case, it is incredible that in the mile and from six to ten minutes which elapsed before the collision they were not able to make those on the schooner steer to the eastward of the dredge, for it will be observed that, on the tug's own contention that the schooner did not starboard her helm until just before the collision, even that short a time was sufficient for her to avoid a head-on blow. But the evidence satisfies us that the tug delayed her sheer too long. The schooner's witnesses prove the tug was heading slightly to the west of the dredge when she took a sudden sheer to the eastward, that the schooner tried to follow, and it was on this sheer the tug's whistle was first blown. Martin, the watchman of the dredge, was amidships when he first heard the tug whistle. He heard her blow twice, looked up, and she was then abreast the dredge with her stern pointed towards her. Martin at once blew the dredge's whistle and sang out. Now, if the tug's story is cor-

rect, that she had blown her whistle several times before, there is no reason why the attention of the dredge's watchman was not sooner attracted. That it was not is conceded by the dredge's answer, viz.:

"When the tug was first sighted by the dredge she was to the eastward of the dredge and clear of her; the schooner was astern of the dredge. The course of the two vessels was at right angles to each other. The respondent's servants heard the tug's whistle to her tow and the respondent's vessel likewise whistled in order to call the schooner's attention to the whereabouts of the dredge."

Martin's testimony strongly corroborates the schooner's men, who fix the first whistle as made on the tug's sheer when she was at right angles to the dredge. Thus Stuart, the schooner's mate, says:.

"Q. Did you hear any whistles by the tugboat?
"A. I did, sir.
"Q. One whistle or several blasts?
"A. Several short blasts, toots.
"Q. How many sets of blasts did you hear?
"A. I could only distinguish one, sir.
"Q. When was that?
"A. Just before the collision.
"Q. Well, when was it with respect to the time you gave the order hard to starboard?
"A. It was almost at the same time, sir.  *  *  *
"Q. How many sets of blasts did you hear from the dredge?
"A. One.  *  *  *
"Q. And at the time you heard that set from the dredge the tugboat was well off to the eastward, was she?
"A. Yes, sir.
"Q. On your port bow?
"A. Yes, sir; on our port bow."

Smith, the schooner's lookout, says:

"Q. Did you hear any whistles from the tugboat?
"A. Yes, sir.
"Q. Were they before or after the mate gave the order hard to starboard?
"A. They were just about the same time as he gave the order, just about when he sang out.
"Q. How many blasts were there, if you remember?
"A. I can't say, sir.
"Q. You don't know how many toots?
"A. No, sir.
"Q. Well, were there one set of blasts or more?
"A. One.
"Q. Did you hear any whistles from the dredge?
"A. Yes, sir.
"Q. When was that?
"A. Just when we struck the dredge."

The account of Jorgansen, the wheelman, is:

"Q. Then you had starboarded your wheel before the mate gave the order to starboard?
"A. Yes, sir.
"Q. Did the mate give you any other order after the order to starboard?
"A. No, sir; he didn't give me any other order before the tug blew her whistles; at least, it was the same time when the tug blew."

Cullendar, the steward, said:

"Q. Did you hear any whistles blown by the dredge on the morning of this collision?

"A. Yes, sir.

"Q. How many times did the dredge whistle?

"A. I only heard it once.

"Q. How many times did you hear whistles from the tugboat?

"A. Once.

"Q. How soon after the tugboat blew her whistle did you hear the dredge whistle?

"A. Very shortly."

The testimony of the schooner's captain who came on deck just before the collision was:

"Q. Captain, you said you heard whistles from the McCaulley?

"A. I heard a whistle as I came out.

"Q. Did you hear whistles more than once?

"A. I think I did.

"Q. How many times?

"A. I would not be sure whether I did or not. I think I heard some from the tug and some from the dredge; but I could not distinguish them apart.

"Q. How many times did you hear whistles blown before you came out on deck?

"A. I think once or twice.

"Q. What kind of whistles were they?

"A. Kind of short toots.

"Q. Are they what is generally known among seafaring people as 'attention whistles'?

"A. They are just what little tugboats use just when they are going across the bow. They give whistles to get out of the way.

"Q. How many blasts are blown in succession?

"A. Two or three.

"Q. They are what are generally known among seafaring people as short whistles?

"A. Yes, sir.

"Q. As I understand, you can't say now whether you heard those whistles once or twice?

"A. No, sir; I do not know whether I heard several short blasts once or twice.

"Q. That is before you got on deck?

"A. Yes, sir.

"Q. What is your best recollection whether you heard them once or twice?

"A. I said that I heard them once or twice. I heard some toots, and that is all I can say about it. Whether they were two sets I don't remember.

"Q. How long were they apart?

"A. Just 'toot,' 'toot,' like that.

"Q. How long were the different sets of toots apart?

"A. I could not say, as I can't swear that I heard more than one. Everything happened so quick that it all seemed to happen right together."

Now, this testimony, as we said, is corroborated by that of Martin, its watchman, who was called by the dredge:

"My attention was drawn to the whistle of this boat McCaulley, the tugboat.

"Q. Where was she when she whistled?

"A. She was about abreast of the machine to the eastward.

"Q. How far to the eastward do you think she was, and how far?

"A. 200 or 300 feet probably.

"Q. Was she presenting her side to you or stern?

"A. The stern to the dredge, heading toward Jersey; to the eastward, I suppose you would term that.

"Q. Where was the schooner?

"A. The schooner was astern of the dredge bearing down on the dredge, showing both side lights.

"Q. What did you do?

"A. I commenced to blow whistles, to blow the dredge's whistles to draw their attention; and also hollowed. ＊ ＊ ＊

"Q. What was it attracted your attention to the tugboat?

"A. I heard the whistle blowing.

"Q. What position was she from you—about opposite your stern to the eastward?

"A. Yes, I judge so, heading for the Jersey shore to the eastward. ＊ ＊ ＊

"Q. And nothing attracted your attention until you saw the tug sharp off to the eastward?

"A. No, sir; that drew my attention, hearing those whistles. I knew there was something approaching."

Now, while the tug's witnesses place the whistles away back on the course, the testimony of Martin is in accord wtih those on the schooner, that the tug whistled first when she was making the sharp sheer to the east and when she was abreast the dredge. We are satisfied that the tug, instead of beginning the sheer a mile away, began it when it was too late for the schooner to avoid the dredge, and that, after she began the maneuver, the schooner did all in her power to follow her. Her duty was to follow the tug, and, having done all in her power to do so, she fulfilled her duty.

After a careful examination of all the testimony, we are clear in the opinion that the cause of this collision was the improper delay of the tug in starting to sheer to the east of the dredge. The decrees of the court below must therefore be reversed, and the case remanded, with directions to dismiss the libel filed by the dredge against the schooner, and to enter a decree in favor of the dredge against the tug, and in favor of the schooner on the schooner's libel, one-half of all the schooner's costs to be taxed on each bill.