**THE J. C. HARTT, and seven other cases.**

District Court, S. D. New York.

Feb. 7, 1924.

Leo J. Curren, of New York City (Frederick Pennell, of New York City, of counsel), for libelant Flannery.

Park, Mattison & Lynch, of New York City (Henry E. Mattison, of New York City, of counsel), for libelants Mylott, Trumbull, and LaFontaine.

Foley & Martin, of New York City (William Shea, of New York City, of counsel), for libelant Whitehead Bros. Co.

Macklin, Brown & Van Wyck, of New York City (William Van Wyck, of New York City, of counsel), for libelant Ore Carrying Corporation.

Duncan & Mount, of New York City (Warner Pyne, of New York City, of counsel), for the United States.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for Cornell Steamboat Co.

GODDARD, District Judge.

These are suits brought to recover damages alleged to have been sustained as a result of a collision between a tow of barges bound up the Hudson river, with the steam canal boat Ulster having in tow four canal boats coming down.

The tug Hartt, assisted by the tug Decker, left New York City on September 28, 1920, with a fleet of 47 barges, some light and some loaded in tow astern with a hawser of 75 fathoms, there being six boats abreast in the hawser or first tier; these being referred to hereafter as the Cornell tow.

The Ulster, a steam canal boat, was coming down from Troy and had 4 loaded barges in tow. Her tow was made up with a barge fast to her port side, another barge on her starboard, and two barges astern on short hawsers. The collision occurred on September 29, 1920, at about 8 p. m. north of West Point just below Magazine Point; the tide was strong ebb, and, owing to the bend in the river, sets strong to the west. The river in this vicinity is about 1,400 feet wide. The Ulster and her tow were moving with the tide about 6 miles an hour and the up-bound tow between 1 and 2 miles an hour.

The starboard barge of the Ulster tow came in contact with the starboard side of the head tier of the Cornell tow, and as a result two boats in the Cornell tow sank and other boats in both tows were damaged.

Two libels were filed by Mylott, one being in rem against the tug Hartt alone, and the other being in personam against the Cornell Steamboat Company, presumably to recover any alleged damage which might not be recoverable against the Hartt itself. The libel of Whitehead Bros. was on account of alleged damage to and loss of cargo which was on the Mylott; the other libels were for alleged damages to barges.

The petition of the Cornell Steamboat Company impleading the United States, briefly summarizing its statements of facts, alleges: That the Cornell tug Hartt, assisted by the Decker, with a float of barges in tow astern on a hawser, was in the reach of the Hudson river between West Point and Magazine Point; that a proper and efficient lookout was being kept by the tugs; that, in accordance with customary and proper navigation for tows bound up river against the ebb tide, the tow was navigating to the westward of the center of the river. That the Ulster was sighted down bound with her tow made up in an unseamanlike manner; that the Hartt blew two, and, on receiving an answer of two, put her helm to starboard and continued to pull her tow to the westerly bank; that the Ulster came on without any apparent change of course; that the Hartt blew an alarm; and that the collision occurred abreast of Magazine Point, a short distance out from the westerly side of the river.

The government's answer alleges that, when the vessels were about half a mile apart, an exchange of two whistles took place; that the Ulster immediately starboarded her helm, altering her course to port, which brought her close to the easterly bank; that her helm was hard starboard abreast of Magazine Point lighthouse, and that, when the government's tow was below the lighthouse, the first tier of the Hartt's tow sheered to starboard and collided with the government tow.

The Ulster was in charge of a captain and mate; neither of whom had a license for the Hudson river, or had navigated a vessel in the Hudson river, where this collision occurred; neither was familiar with the local-

ity of the collision, or the tidal conditions existing there.

It is surprising and a shock to find the government breaking one of its statutes, and for no apparent reason. Section 4438 of the United States Revised Statutes (46 USCA § 224) expressly forbids employing as master, mate, or pilot, on such a boat as this, which was not a vessel of the United States Navy, unless duly licensed. Disregard of this wise regulation should be severely condemned. The master's total lack of experience in navigation on the Hudson river, and of the tidal conditions where this occurrence took place, undoubtedly were the real cause of this collision, and has made it necessary for the owners of these barges to come into court to recover damages which they have suffered without any fault on their part. Aside from the presumption of fault which arises against a vessel where she violates a statutory requirement, The John F. Tolle (C. C.) 12 F. 444; The Henry O. Barrett (C. C. A.) 161 F. 481; The Eagle Wing (D. C.) 135 F. 826, 832; The City of Baltimore (C. C. A.) 282 F. 490, it affirmatively appears that the Ulster was at fault.

When the captain of the Ulster first saw the Cornell tow she was about a mile distant; when about a half mile apart signals for passing starboard to starboard were exchanged. At the time those signals were exchanged the Cornell tow was a little to the westward of the center of the river and the Ulster was in about the same position but on a course she would have to change owing to the bend in the river; otherwise she would have eventually gone into the westerly bank. Both tows subsequently altered their courses, the Cornell tow pulling toward the westerly bank and the Ulster towards the easterly bank. How far each had gotten when the collision occurred is a disputed question. Witnesses for the Cornell tow state that the tugs were near the westerly bank, and that the tows were straight behind the tugs when the collision took place. The captain of the Ulster has testified he passed about 200 feet off Magazine Point, which was on the east side. After considering all the detailed circumstances and the fact the witnesses who so testified impressed me as reliable, I find that the collision occurred somewhat westerly of the middle of the river. The captain of the Ulster testified that, as the Ulster passed the Hartt, there was about a distance of 150 to 300 feet between his starboard side and the starboard side of the Hartt. His mate stated the distance to be 300 to 350 feet; that shortly after he noticed the first tier of the Cornell tow sheering towards him; that, although he headed directly in towards the land, the starboard side of the barge in the first tier struck his starboard tow. The contention of the Hartt is that, instead of its tow swinging over to the eastward, the Ulster and her tow was swept down and westward against the Cornell tow. It conclusively appears that the ebb tide as it comes down the river strikes against the bend around Magazine Point and then sets off to the westward, and that, at the point where this collision occurred, there is a strong set of tide away from Magazine Point, so that any swing of the Cornell tow towards the Ulster would have been against the tide, and it is difficult to imagine, with her tugs in the position which they were, how her tow could have suddenly swerved to the eastward against the tide in the interval between the time the Ulster passed the Hartt and the happening of the collision, in view of the fact that the Hartt was only moving between 1 and 2 miles an hour. On the other hand, if the Ulster had miscalculated, and, finding herself out too far from Magazine Point, attempted to head in towards that shore, the tide would catch her tow more or less broadside and sweep her to the westward. Capt. Clark of the Ulster admitted that the effect of putting the helm hard over on the Ulster would be to slew the stern of the tow faster than the bow; that the set of the tide at the bend of the river where the collision occurred undoubtedly contributed to the collision, and that he did not know at the time of the collision what the set of the tide was at that point. This, I think, clearly shows how and why the collision happened.

While it is not set up in the pleadings, the Ulster now claims there was a violation by the Cornell tow of the Narrow Channel Rule. Referring to the Narrow Channel Rule in The Benjamin Franklin (C. C. A.) 145 F. 13, 16, Lacombe, Circuit Judge, stated: "It will be observed, however, that the rule is not of universal application. It is to be followed only when it is safe and practicable to do so." And considering the nature of the channel, it is significant that in The Benjamin Franklin, supra, the Circuit Court of Appeals in enforcing the Narrow Channel Rule in the Hudson river opposite Yonkers emphasized the fact that above and below that point for some miles the river "runs without a bend." However, it is unnecessary in this case to determine whether or not there was a violation of the Narrow Channel Rule. Experts of many years' experience in navigation on the Hudson river have testified that

926

there was a custom for upbound tows to keep to the west side of the channel at Magazine Point on the ebb tide; moreover, the masters of both the Ulster and the Cornell tows had agreed to a starboard to starboard passing, and I have already found that the easterly half of the river was clear for the Ulster.

No bend signal was blown by the Cornell tow, but, as the boats observed each other a mile apart and the captain of the Ulster made no change in his course until half a mile apart, the failure to blow a bend signal could not have contributed to the happening of the collision. The captain of the Ulster admitted when questioned regarding the lack of a bend signal:

"Q. If it warned you, I want you to tell us what you would have done differently if you had got a warning? A. I don't know as I would have done anything different.

"Q. Then it would not have made any difference? A. It would not have made any practical difference in my judgment."

Accordingly, a decree may be entered in favor of each of the libelants against the claimant Ulster, with references to ascertain the damages, and dismissing the libels against the tugs Hartt and Decker and the libel of the United States of America against the Cornell Steamboat Company.