## THE NASSAU (two cases).

### THE TERJE.

Circuit Court of Appeals, Second Circuit.
July 22, 1929.

On Rehearing, November 19, 1929.

Nos. 206–208.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for appellant Terje and her owner.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass. (Miles Wambaugh and Foye M. Murphy, both of Boston, Mass., of counsel), for appellant Frederick J. Bruce, Inc.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson, of New York City, of counsel), for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge (after stating the facts as above). Much of the argument has revolved about a dispute as to a custom that vessels bound west on the flood tide go down on the Astoria side of the channel and pass east-bound vessels at Hallett's Point starboard to starboard. Such a custom has received recognition in this court. The Transfer No. 21, 248 F. 459; The C. Gallagher, 262 F. 97. The dispute is whether it applies at so late a stage of the flood tide as existed in the instant case. The Terje's evidence indicated that the tide was negligible, and that the custom ceases when the velocity of the flood tide is sufficiently reduced to render safe a return to the usual narrow channel rule. The Nassau, on the contrary, took the position, and supported it by expert opinion, that the custom continues up to the very moment of slack water. Her witnesses testified to a tide of at least a knot and a half. The tide was running ebb past the dredge at 12:55, and the usual period of slack water at Hell Gate is testified to be about three minutes. It seems incredible that, six minutes before slack water, the tide could have had any such strength as the Nassau's witnesses claimed for it, but we do not find it necessary to decide this disputed question of fact, nor to determine the precise conditions under which the custom prevails. If a port to port

passage was proper the Terje should have held to her own side of the channel.

 The evidence of disinterested witnesses, and particularly of Reilly, to whose testimony the trial court gave especial credence, shows that she did not do so. His diagram, drawn to scale, placed her about 250 feet from the Astoria shore. While his recollection on the stand was more favorable to her, he held to his original estimate when the discrepancy was called to his attention. Moreover, had she not been considerably on the port side of the channel when she sighted the Nassau, her hard-aport helm, resulting in a swing of two to three points, would certainly have carried her further over on the starboard side of the channel than she was at the moment of collision. There is dispute as to just where the collision occurred, but Reilly's diagram, which the Terje accepts, puts it about 40 feet beyond the center line. Hence, if the narrow channel rule applied, the Terje came down on the wrong side of the channel, and this fault is not shown to have had no causal relation to the disaster merely by the fact that she got back to the right side at the moment of collision. If, however, the custom applied at that stage of the tide, the Terje was obliged to give the east-bound vessel the right of way and pass to starboard. Hence on neither hypothesis can her navigation be justified.

Moreover, she was found at fault in failing to blow a bend whistle. If the Terje sounded no bend signal below the railroad bridge, she violated rule 5 of article 18 of the Inland Rules, for the bridge is more than half a mile distant from Hallett's Point. She asks us to reverse this finding of the lower court. Her master, chief officer, second officer, and lookout testified by deposition that such a signal was blown, without very definitely fixing her location at the time. Pilot Horton, her only witness examined in court, testified on direct that he blew the bend whistle about under Hell Gate bridge, and on cross-examination marked the place on the chart as almost half way between the bridge and Negro Point. On the other hand, Capt. Holmes, of the tug volunteer, which met the Terje a little below Negro Point, and Capt. Parkinson, of the steamer Riverside, which closely followed the Terje down the river, testified positively that the Terje blew no signals whatever. Reilly and Panzenhagen, who were also independent witnesses, testified that they heard no bend signal from the Terje. On such a record we cannot say that the finding is unsupported by evidence. The faults with which the court charged her are, in our opinion, substantiated, and she is not entitled to exoneration from liability.

 There remains the question whether the Nassau was rightly exonerated. The trial court made no specific findings regarding her navigation, other than that she properly sounded a bend signal, but says generally that she exercised every possible precaution. With this conclusion we cannot agree, after a careful reading of the record. Her master says that he shaped her course with reference to the custom which requires a starboard passing on the flood tide. Nevertheless she passed the Point within 300 feet of the shore, and claims to have hugged the eastern shore as closely as she safely could with due regard to her draft. If she was relying on the custom, she should have kept to the port side of the channel, which would have enabled the vessels to see each other sooner; if, on the other hand, the custom did not apply at that stage of the tide, and a port to port passage was proper, she should have rounded the Point more closely than she did. Her course evidently was shaped to carry her into the port side of the channel, for, even after reversing, when her master saw the Terje, she could not avoid getting across the center line. She doubtless was relying on the channel being clear, because she had heard no reply to her bend signal; but this did not justify disregarding the rule of the road, and this she did, whether the custom was or was not applicable to the existing stage of the tide.

 Furthermore, we are not convinced that her navigation was free from fault after the Terje was, or should have been, discovered. All but one of the Nassau's crew testify that the Terje was distant only a length or two of the barge when she was sighted. If true, she should have been sighted earlier. Bertram, the second mate, who was stationed as lookout on the bow of the barge, testified that the Terje was about 1,200 feet away when he reported her. This conforms fairly closely to the estimate of a quarter of a mile, made by the Terje's witnesses. We accept this estimate of the distance between the vessels when they became visible to each other. Bertram reported that a vessel was coming out of Pots Cove, but the master took no action until he saw her himself, which he says was a minute later. He estimated her distance at that time as only 400 or 500 feet. Had he acted at once on the lookout's report, the collision would probably have been averted, for the vessels came within 35 feet of clearing as it was. It is true that the log of the Nassau showed that the engines were in reverse

for four minutes before the collision; but it was written up after the event, and we regard it as demonstrably erroneous, being inconsistent, not only with the testimony of the crew, but with the probabilities, in view of the stated speeds of the approaching vessels.

Similar criticism may be made of the log of the Terje, upon which the appellee has relied to support numerous arguments based on the premise that the Terje took 17 minutes to pass from Hell Gate bridge to the point of collision. Her log entry of 12:30 as the time of passing under the bridge we do not credit as accurate. It is inconsistent with the testimony of her own crew and with the probabilities at that stage of the tide. It is claimed that the Nassau swung 45 degrees to starboard. This is a palpable exaggeration. Reilly observed no change in her course, and Parkinson said she swung slightly. Had her master ordered the helm of the barge as well as the tug to be put hard aport, possibly the swing would have been great enough to clear.

For the reasons given above, we think the Nassau was not free from fault, and that she must share equally with the Terje responsibility for the collision. The cause is therefore remanded, with directions to modify the decrees in conformity with this opinion.

## On Rehearing.

In the original opinion we condemned the navigation of the Nassau for failing to round Hallett's Point closely, if the alleged custom did not apply, and for failing to keep far enough toward the port side of the channel, if the alleged custom did apply. We also noted faults in her navigation after the Terje was or should have been sighted.

A petition for rehearing challenged especially the statement that the Nassau should have kept further to port, if she was navigating with reference to the custom. It was asserted that we had added to the custom a requirement not supported by the evidence, contrary to the established practice of navigators, and not discussed in the arguments or briefs. In order that this question might be thoroughly presented, a rehearing was granted as to the liability of the Nassau.

The evidence of the custom is not very enlightening as to how the east-bound vessel should navigate in passing Hallett's Point. The witnesses agree that the west-bound vessel should cross over to the Astoria shore and hold back above Hallett's Point until the east-bound vessel has passed. Whether the latter should hug the starboard side of the channel until she has cleared the Point is

not mentioned by any witness except Captain Earl Palmer. He testified:

"Well, the custom prevails that in the strength of the tide vessels bound west would hold to Negro Point, or Hallett's Point. If east-bound, the vessel would stay close to Hallett's Point.

"Q. As I understand, then, the custom is that, on the strength of a flood current, a vessel bound east may pass close to Hallett's Point, and a vessel bound west may wait short of Hallett's Point for her to get by; is that correct? A. With any strength of the tide, yes, sir."

But the force of this testimony is weakened by his answer to the next question addressed to him:

"Q. On how late a stage of the flood tide would that custom or practice prevail? A. Why, personally I would say 45 minutes of slack water."

If the whole of Captain Palmer's testimony were accepted, the custom which he described did not apply at the time in question. We do not feel bound, therefore, to accept as conclusive his description of what the custom is. The custom, as described by witnesses who testified that it did apply at the time in question, defines the duty of the west-bound vessel to hold back and allow a starboard to starboard passing, but says nothing as to whether the east-bound vessel is to hug the right-hand side of the channel until Hallett's Point is cleared. The War Department Regulations recognizing the custom are equally silent.

The custom was explained by this court in The Transfer No. 21, 248 F. 459, 461, as follows:

"It was abundantly proved that vessels going west strike over from Negro Point to the Astoria side of the channel, so as to get the benefit of the eddy in rounding Hallett's Point, while vessels going east keep to the middle of the channel and cross over to the Ward's Island side, coming down near Negro Point, so as not to be carried by the tide onto Scaly Rocks. This is especially true of hawser tows. In other words, vessels meeting, going east and west, pass starboard to starboard on the flood tide at this point."

If one purpose of the custom is, as there stated, to aid the east-bound vessel to avoid being carried by the tide onto Scaly Rocks, it is apparent that this purpose will be the better served, the farther off shore she is in rounding Hallett's Point. Moreover, if the east-bound vessel keeps toward the port side of the channel, she will the sooner be able to see any vessel above the Point. A custom

which would require each vessel to hug the Astoria shore, thus bringing them upon each other suddenly at the Point, would produce conditions fraught with grave danger of collision, if either should not be under perfect control, or if they came upon one another unexpectedly, because of dereliction in exchanging signals. Consequently, we believe that the rule we announced as to the duty of the east-bound vessel to favor the left-hand side of the channel in rounding Hallett's Point is a reasonable corollary of the custom described by the witnesses, namely, the custom of a starboard to starboard passage, the west-bound vessel having crossed to the Astoria side and being bound to hold back above the Point. The corollary is no more a violation of the narrow channel rule than is the custom itself. It is not contrary to the testimony concerning the custom given in this record. Courts should be slow to lay down rules of navigation contrary to the practice of experienced navigators. We do not think we have done so in this instance. If on some other record the evidence should show that in fact the practice of east-bound vessels is to hug the Point, the reasonableness and validity of the custom so proved will still be open for decision.

Nor is our decision inconsistent with the case of The Transfer No. 8 (C. C. A.) 96 F. 353. There the tug Transfer No. 8, bound down out of the Harlem River, collided at Horns Hook with a vessel bound up the East River, which had failed to blow a bend signal. The District Court held that the latter was not required to blow a bend signal, because she did not intend to make the turn into the Harlem River, and that the Transfer No. 8 was solely at fault, because she should have kept further from the New York shore, so as to be better able to see any up-bound vessel. In reversing the decree, this court held that the up-bound vessel was required to sound a bend signal on approaching Horns Hook, and that the Transfer No. 8 was not at fault in navigating near the shore, because she was entitled to assume that no vessel was approaching. But the Transfer No. 8 was navigating on the proper side of the channel. There was no custom that up-bound vessels should hug the New York shore below Horns Hook, and so there was no reason why down-bound vessels above the Hook should not navigate on the starboard side of the channel, on the assumption that no vessel was below. The case cannot be thought to lay down the rule that a vessel may with impunity navigate on the wrong side of the channel, merely because no bend signal was blown by an approaching vessel. In the case at bar the Nassau was, for reasons already stated, on the wrong side of the channel, on the assumption that the custom obtained at that stage of the tide.

Therefore we adhere to our former opinion.