THE GOVERNOR WARFIELD.

THE SOCONY NO. 5.

Nos. 10155, 10980.

District Court, E. D. New York.

Jan. 28, 1930.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (A. M. Menkel, Sp. Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for the United States.

Macklin, Brown, Lenahan & Speer, of New York City, for Socony No. 5.

Foley & Martin, of New York City, for Arundel Corporation.

CAMPBELL, District Judge.

The two above-entitled suits on stipulation were tried together, the United States of America having been impleaded in the first above-entitled suit, on the petition of Standard Transportation Company, claimant of motor vessel Socony No. 5.

On evidence which is somewhat conflicting, I find as follows:

The Governor Warfield, a dredge owned by the libelant Arundel Corporation, 120 feet long and 42 feet wide, was engaged in a dredging operation on the Middle Reef area, Hell Gate, East River, New York, under contract with the United States government, and

had been engaged in the same general locality since December 9, 1926.

The Governor Warfield was headed in a westerly direction, and was pinned on certain ranges in that place about midway between Mill Rock and Hallets Point.

A United States engineers' scow, A–50, 145 feet long by 39 feet wide, was made fast on the starboard or northerly side of the dredge.

No fault is alleged on the part of the Governor Warfield, and she was without fault.

Between 7 and 8 o'clock p. m. on February 28, 1927, a United States engineers' scow No. 22, 145 feet long and 42 feet wide, loaded, bound east, in tow of the United States engineers' tugs Major Fraser, 102 feet long and 45 feet wide, and Deland, 102 feet long and 25 feet wide, the Major Fraser being made fast on the scow's starboard side, and the Deland on the scow's port side, was proceeding between the dredge Warfield and Hallets Point. When the Deland was within 100 feet of the bow of the Warfield and between 100 and 200 feet off on the side toward Astoria, the Socony No. 5, which had opened up Negro Point, and was 2,000 feet distant from the Deland, was observed by the Deland, and at the same time observed the Deland and tow of the dredge.

The Deland blew a one-whistle signal, which was answered by the Socony with a one-whistle signal for a port to port passage.

The Socony No. 5 was light, bound west from Boston for Empire Yard, Greenpoint.

The wind was from the northwest, but there is no contention raised that the wind had any effect. The tide was the first of the ebb, with a force of about one-half knot, and the master of the Socony No. 5 says that it had no effect on the collision.

The master of the Socony No. 5 says that at the time the Deland blew the one-whistle signal, the tugs and tow seemed to be right under the dredge on the west side.

The Deland and Fraser, with the scow loaded with about 1,000 yards of mud and drawing 14 feet, were not making over two knots an hour, but the Socony No. 5, light, was making greater speed, although she says she was running on a slow bell.

The Deland and Fraser expected the Socony No. 5 to go to the west of the dredge as provided by the regulations of the Secretary of War, and slowed down and ported their helms, and the tugs and tow went toward the Astoria shore, being at the time of the collision nearer the Astoria shore than when the signal was given.

The Socony No. 5 continued to proceed, always on a course headed toward the stern of the dredge.

About 1,000 feet distant from the tugs and tow, the Socony No. 5 stopped her engines, but still had headway sufficient to steer, and had headway when she had arrived at a point 50 feet off the tugs and tow, when she went full speed astern on her engines in an effort to stop her headway.

There is testimony on the part of the Socony No. 5 as to the sounding of alarms, but the witnesses called on behalf of the tugs and their tow say that no signals, other than the one-whistle signals, were blown by either; but accepting the positive testimony on behalf of the Socony No. 5 that such signals were blown, no change could have been made by the tugs and tow to relieve the situation.

When the Socony No. 5 started to back, she was about 50 feet from the Deland, and in backing lost control and the port bow of the Socony No. 5 came into contact with the port side of the Deland, damaging the Deland, and the Socony No. 5 sheered to starboard and struck the port side of the dredge Warfield about 40 feet from the bow, damaging her and putting her out of work.

The principal fault charged against the Socony No. 5 is that she passed on the wrong side of the dredge in violation of the regulations of the War Department, approved March 12, 1924, paragraph 7 of which reads as follows: "7. During the continuation of work on Middle Reef, west bound tows and car-floats, when going through the Gate at ebb tide, shall pass between Mill Rock and Wards Island, and around to the westward of Mill Rock; west bound steamers proceeding under their own steam, or under their own steam assisted by tugs alongside, shall pass between the dredging plant on Middle Reef and Mill Rock or to the westward of Mill Rock."

These regulations were approved under the authority of section 7 of the River and Harbor Act of August 8, 1917, 40 Stat. 266, now the first paragraph of section 1, title 33, U. S. C. (33 USCA § 1, par. 1), which reads as follows: "Section 1. Regulations by Secretary of War for navigation of waters generally. It shall be the duty of the Secretary of War to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in

his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement, covering all matters not specifically delegated by law to some other executive department. Such regulations shall be posted, in conspicuous and appropriate places, for the information of the public, and every ·person and every corporation which shall violate such regulations shall be deemed guilty of a misdemeanor and, on .conviction thereof in any district court of the United States within whose territorial jurisdiction such offense may have been committed, shall be punished by a fine not exceeding $500, or by imprisonment (in the case of a natural person) not exceeding six months, in the discretion of the court."

These regulations are stated therein to be "prescribed to govern the use, administration, and navigation of Hell Gate, East River, New York, for the purpose of preventing interference with the operations of the United States in widening and deepening the channel of Middle Reef."

 On behalf of the Socony No. 5, it is argued that the regulations should not have been received in evidence, on the ground that they were incompetent and immaterial, and are not binding for the following reasons:

1. The statute in so far as it authorizes the Secretary of War to prescribe regulations for navigation is unconstitutional, as an improper delegation of legislative power to an executive officer.

2. The statute properly applied does not authorize the Secretary of War to establish rules of navigation.

3. The Act of August 8, 1917, if valid, authorizes the Secretary of War to prescribe regulations for the prevention of interference with channel improvements, and not to prescribe rules to prevent collisions between vessels.

The first ground of objection does not find support in the decisions of the courts.

The first paragraph of the section of the act in question, now section 1, tit. 33, U. S. C. (33 USCA § 1, par. 1), is taken from section 4 of the River and Harbor Act of August 18, 1894, which as originally enacted made it the duty of the Secretary of War to prescribe rules and regulations for the use, administration, and navigation of any and all canals and similar works of navigation owned, operated, or maintained by the· United States, and provided for the posting of such regulations and the punishment of vio-

lations thereof, and the constitutionality of such provision was sustained in United States v. Ormsbee (D.·C.) 74 F. 207, and United States v. Moody (D. C.) 164 F. 269.

Likewise in United States v. Breen (C. C.) 40 F. 402, the Act of Congress of August 11, 1888, § 5, 25 Stat. 424, authorizing the Secretary of War to make such rules and regulations as may be necessary to protect improvements on the Mississippi, and providing that any violation of such rules shall constitute a misdemeanor, etc., it was held not to be invalid as conferring legislative authority on the Secretary. At page 403, Mr. Justice Lamar says: "If the law empowered the secretary of war, by rule or regulation, to make a certain act criminal, and punishable as such, then this prosecution would not be maintainable; but it is not the rule and regulation which declares the violation thereof a crime, and punishable. .All that the secretary is authorized to do is to make the rule and regulation. It is the act of Congress which declares that the unlawful and willful violation of such rule and regulation, after it is promulgated, shall be held a misdemeanor by the person violating the same. * * * "

I therefore conclude that the statute authorizing the Secretary of War to make the rules and regulations in question is constitutional.

The second ground of objection requires no further discussion, because what .the Secretary of War was attempting, in the regulations in question, was not the establishment of general rules of navigation, but merely local rules for the protection of the particular work being performed, and the instrumentalities engaged in such work, whether the property of the government or one of its contractors.

The third ground of objection is stated too broadly. While it may well be true, and I believe it is, that the Secretary of War has not the power to establish general rules of navigation, as they have been established under the authority delegated to the Department of Commerce, and therefore are excepted under the provisions of the act, supra, which reads as follows, "covering all matters not specifically delegated by law to some executive department," and in that sense is not authorized to prescribe rules solely to prevent collisions between vessels, yet for the purpose of protecting the work and the instrumentalities engaged in channel improvements, the Secretary of War may make rules to prevent collisions between vessels, in·the

area of the improvement, when it may reasonably be believed that such collisions would endanger the work or the instrumentality engaged therein, as it happened in the collision which forms the basis of the instant suits.

The rules and regulations in question, supra, were lawfully adopted and binding.

On behalf of Socony No. 5, it is contended that it was not negligence to depart from the regulations because of a custom for vessels to pass to the east of the dredge.

Of course, a custom to depart from the rules, if based upon safety and not upon mere convenience, is valid. The Transfer No. 21 (C. C. A.) 248 F. 459, 461; The Tug J. C. Hartt, 39 F.(2d) 923, 1924 A. M. C. 536; The Cornell (D. C.) 134 F. 694; The Terje (C. C. A.) 35 F.(2d) 709, 1929 A. M. C. 1758; S. S. Michael Tracy, 40 F.(2d) 703, opinion of Judge Woolsey, U. S. D. C., Southern District of New York, September 11, 1929.

Custom as a defense should be pleaded, and there was no such plea interposed by the Socony No. 5 in its answers, nor was any motion made on her behalf on the trial to amend by interposing such plea.

Waiving for the moment, however, the failure to plead custom, I do not think the proof sufficient to establish it at the first of the ebb tide, nor did the Socony No. 5 navigate in accordance with such custom.'

Under the custom claimed by Socony No. 5, it seems that at flood tide, vessels pass between the dredge and the Astoria side, and this is recognized in Regulation No. 8, of the Secretary of War, supra, which provides as follows: "8. West bound vessels, tows and car-floats on the flood tide, when arriving at Hallets Point shall give the vessels and tows coming in the opposite direction, or eastbound, a chance to safely get by the contractor's plant before proceeding around Hallets Point." But the evidence in the instant suit does not convince me that with a one-half knot ebb tide vessels like the Socony No. 5 cannot safely pass to the east of the dredge.

But even if the custom prevailed, then the place of the Socony No. 5 would have been well over on the Astoria side, passing the Deland and tow starboard to starboard, instead of attempting to pass between the Deland and the dredge.

The Deland was well over toward the dredge, the position in which she should have been if the custom prevailed.

The Deland gave the signal for a passage in accordance with the regulations of the Secretary of War, supra, and to prevent any interference with the Socony No. 5, in passing to the west of the dredge, ported her wheel and went somewhat to starboard.

The Socony No. 5, although now claiming the right by custom to pass starboard to starboard, on the Astoria side, did not sound a two-whistle signal and go to that side, but accepted the one-whistle signal of the Deland and continued on a course always for the stern of the dredge, instead of porting her wheel and passing to the west of the dredge, and it was solely due to her fault that the collision with the Deland occurred, of which the collision with the dredge Warfield was the natural consequence.

There is a claim that the Deland was at fault in not sounding a bend whistle, but I cannot find that such failure in any way contributed to the collision, as the vessels were 2,000 feet distant when first observed, and there was plenty of room for the Socony to have gone over to the Astoria shore if that had been the intention at the time.

The collision occurred solely because the Socony No. 5 endangered the dredge Warfield by attempting to pass between the Deland and the Warfield, in violation of the regulation of the Secretary of War, supra.

If the regulation was effective, the Deland was navigating properly.

If the custom was effective at the then state of the tide, the Deland was properly navigating to allow the passage of the vessel on the port side of the channel going west, as such custom at that place was in derogation of the narrow channel rule.

If the regulation was effective, the Socony No. 5 was navigating improperly.

If the custom was effective at the then state of the tide, the Socony No. 5 should have given a two-whistle signal and gone over on her port side, the Astoria side, and passed the tugs and their tow starboard to starboard.

A decree may be entered in the first above-entitled suit in favor of the libelant, Arundel Corporation, against the Socony No. 5, with costs and the usual order of reference, and in favor of the United States of America dismissing the petition and libel, with costs against the Standard Transportation Company, the petitioner.

A decree may be entered in the second above-entitled suit in favor of the libelant,

United States of America, against Socony No. 5, with costs and the usual order of reference.