644

## THE PORTCHESTER.
### No. 133.

Circuit Court of Appeals, Second Circuit.
Feb. 7, 1938.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for appellant.

Alexander, Ash & Jones, of New York City (Edward Ash and Lawson R. Jones, both of New York City, of counsel), for appellee.

Purdy, Mason & Lamb, of New York City (John E. Purdy, of New York City, of counsel), for libelant.

Earl Appleman, of New York City, for Payne Coal Co., Inc.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

On March 23, 1936, a collision occurred in Hell Gate, N. Y., between the steamer Malang and the coal barge Ellen Daly in tow of the tug Portchester. The barge sank with her cargo and some of the captain's effects and the Malang sustained damage.

The Red Star Towing & Transportation Company, owner of the tug, filed its petition for exoneration from liability or, in the alternative, for limitation. The Maltran Steamship Company, Inc., owner of the Malang, Bartle Daly, owner of the Ellen Daly, and the Payne Coal Co., Inc., owner of the Daly's cargo, appeared as claimants. Bartle Daly and the master of the Daly also sued both the Malang and the Portchester in rem and the Payne Coal Company, Inc., sued the Malang in rem.

Following a hearing comprising all the actions, a final decree exonerating the Portchester and holding the Malang solely at fault for the collision was entered; as were interlocutory decrees against the Malang alone in favor of the owner of the barge, of her master and of the owner of her cargo. The Maltran Steamship Company, Inc., has appealed.

It was proved that a little before 7:45 in the morning of the day above mentioned the Malang, a steamer 343 feet long with a single screw, was in Hell Gate on a trip from Bucksport, Me., to New York approaching Hell Gate Bridge at a speed of about 8½ knots through the water. When she was half a mile east of Negro Point, she sounded a bend whistle without receiving any answer. She was then less than 200 feet off Wards Island, where the channel was about 1,000 feet wide, and was following at a distance of some 700 feet the tug Transfer No. 11, which had in tow a carfloat on either side. As she was overtaking that tug, she sounded a two-blast signal to her just before Hell Gate Bridge was reached but received no answer. At 7:44 her log shows that the Malang stopped her engine; her navigation, which had previously been in charge of her third mate, who was a licensed Hell Gate pilot, was then taken over by her master, who held an unlimited license but not as a Hell Gate pilot and was, indeed, not very familiar with conditions there; and her engine movements thereafter were 7:45 half ahead; 7:45 full ahead; 7:47 half ahead; 7:47 full ahead; 7:48 stop; 7:48 full astern; 7:49 stop; 7:50 full

astern. One of these entries shows an alteration, but that has no significance of present importance. Less than a minute after the last engine change the collision occurred, and whether the Malang was in any way at fault or not depends upon where relative to Negro Point it did take place, as will later be made more plain.

· While ·the Malang was approaching Negro Point behind the· Transfer No. 11, the tug Portchester with her single barge on 90-foot hawsers was also approaching the Point from the east en route to Westchester Creek, N. Y. She was on a course about in the middle of the channel; was 85 feet· long; had 350 horsepower, which was ample; and her barge, the Daly, was about 100 feet long. The weather was fair, and the tide at flood flowing at a speed of from 5 to 7 miles an hour. The trial judge correctly found as to the tide that "the movement was from west to east as to the main current coming up the East River; that current separated south of Mill Rock, much of it flowing easterly between Wards Island and Astoria, and a portion of the westerly reach coming around north of Mill Rock, running easterly between that and Negro Point toward Astoria, and merging into the main current east and south of Negro Point." When so proceeding toward Negro Point and when the tug was far enough away to govern her navigation with reference to the Malang the funnel of that steamer was seen across the Point and not far to the west of it. At about the same time the Malang saw the Portchester.

The decisive things occurred about the time the Transfer No. 11 was to round the Point with the Malang then about her own length behind and the Portchester about abreast of Hog's Back. The Malang was then well slowed down against the tide and could have held back behind the Point, though she was so near the shore of Wards Island that care would be necessary to prevent her stern swinging aground there. Had she held back behind the Point, no fault would have been chargeable to her. But on conflicting evidence the trial judge found that she did come out around the Point into the force of the tide and so into the path taken by the Portchester's tow as the tug attempted to pull clear. Though the issue is extremely close, we think on the whole that the evidence does support the finding, and we accept it.

That being so what happened may be stated as follows: About the time the Portchester saw the Malang she blew her a one-whistle signal which was not answered. Shortly after, and when the Portchester was about abreast of Hog's Back, though the ·interval was too long to have the signals mistaken for one of two blasts, she blew the Malang one again which the Malang then answered with one, concluding the agreement for a port to port passing. About this time, though not for long enough to have had any part in the real cause of the collision, the Malang's master was confused by the signal and movement of the Transfer No. 11. That tug blew two to the Portchester which the Malang's master thought momentarily were for him, but he at once saw the Transfer head over for Pot's Cove and then knew its signal was for the Portchester, which came on with the Transfer so far out of her way that she could have directed her course to starboard sufficiently to comply safely with her port to port passing agreement with the Malang. The trial court thought otherwise, because she had a strong tide underfoot and found that she did alter her course to starboard about two points and all she could. On this point of fact we are unable to agree with the court below. The Portchester's master gave conflicting evidence about it; saying positively that he went to port, a palpably wrong change in course, and then that he didn't and that he did turn to starboard. All in all it seems reasonable to conclude that what he did was to hold on without much change. for an unnecessarily long time, and that when he did go to starboard he was unreasonably close to the Malang, though we agree that the Malang herself was at fault in part for the dangerous proximity at that time. As a result of these two faults, the tow of the Portchester, having swung over with the tide, brought up against the. Malang and sank as before stated.

■ The vessels were, of course, in a narrow channel and were bound to comply with the narrow channel rule. 33 U.S.C.A. § 210. On account of the prevailing conditions in this channel at flood tide compliance with the rule follows when an eastbound vessel approaches the Point as the Portchester did in about the middle of the channel and as the Malang did westbound close to Wards Island, provided such vessel holds back behind Negro Point for the

benefit of eastbound boats. The Transfer No. 21, 2 Cir., 248 F. 459; The Nassau, 2 Cir., 35 F.2d 709. But such partially correct navigation by both is,' of course, no excuse for their failure to navigate with due regard for their port to port passing agreement.

Decrees modified to hold both the Portchester and the Malang at fault for all the damage done.