### THE A. J. RUDDY.
### THE M. A. LENAHAN.
### THE BRIMSTONE.
### THE FORT ASH.

### W. E. HEDGER TRANSP. CORPORATION v. HART.

### Nos. 17467, 17711.

District Court, E. D. New York.
Dec. 12, 1946.

Platow & Lyon, of New York City (Edwin F. Platow and John A. Lyon, both of New York City, of counsel), for W. E. Hedger Transportation Corp.

J. Vincent Keogh, U. S. Atty., of New York City (Max Taylor and Gordon L. Becker, both of New York City, of counsel), for Ernest Hart.

GALSTON, District Judge.

The libel and the cross libel by consent were consolidated at the trial.

On April 23, 1945, at about 7:30 A.M., the tug Brimstone, with the loaded barge M. A. Lenahan on her port side, and the loaded barge A. J. Ruddy on her starboard side, was proceeding on a flood tide toward Whitestone, and was then somewhere between North Brother Island and South Brother Island, in the East River, on her own starboard side of the channel. It is agreed that there was practically no wind and that the visibility was clear. Proceeding from the opposite direction, and then probably about a mile distant, was the steamship Fort Ash. Ahead of the Fort Ash was a vessel, the Ferncliffe, with a cargo of ammunition, described as a "hot" ship. This latter steamship proceeded on the north side of North Brother Island. The Fort Ash, in order to avoid proximity to that vessel—at any rate that was the reason advanced by Breakey, the pilot on the Fort Ash—headed for the south channel between North Brother Island and South Brother Island. It is conceded that there was enough depth of water to enable the Fort Ash to pursue this route, and

while no rigid custom was proved, it seems fairly established that larger vessels of the tonnage of the Fort Ash would more often navigate for the wider and deeper channel on the north side of North Brother Island.

The Brimstone and the Fort Ash sighted each other at a distance of about a mile apart, but there is conflicting testimony in respect to two vital issues. One has to do with signals, and the other with the position of the Brimstone tow as she headed westward through the channel. On the one hand we have the version of the captain and the deckhand of the Brimstone, substantially corroborated by Soderberg, the captain, and Buckley, the mate, of the tug W.S.A. No. 10. They were both disinterested witnesses. In accord too was the testimony of the captain of the barge Ruddy. In sum, these witnesses say that the Brimstone blew one whistle, signalling thus for a port to port passage.

On the other hand, Breakey, the pilot on the Fort Ash, testified he twice gave a blast of two whistles on sighting the Brimstone, which were not answered until the Brimstone, so he said, took a sheer to her starboard, at which time the Brimstone gave a one blast signal. Howell, another Hell Gate pilot who was on the Carmen, and who came up between the North Brother Island and South Brother Island, passing the Brimstone tow, heard the Fort Ash's two whistle signals repeated. Breakey said he blew all the Fort Ash signals himself, but the third officer, Colledge, testified that the two whistle signals were given by him at the pilot's order.

On the question of the exchange of signals, I accept the version of the Brimstone, relying too, to a considerable extent, on the very consistent testimony of the disinterested witness Soderberg.

There is the same grave contradiction in respect to the position of the Brimstone and her tow. The Brimstone witnesses agreed that the Brimstone tow proceeded on her starboard side of the channel, favoring the black buoys; but the Fort Ash witnesses contend that the Brimstone was heading along the red buoys on her port side of the channel.

In the endeavor to resolve the contrary versions in respect to exchange of signals and the position of the Brimstone tow, some light is thrown on the matter of position of the Fort Ash by the Ash's witness, Joseph Nee. He was in charge of the tugboat Pentucket, assigned to meet the Fort Ash off Hunt's Point and to escort her on her westerly voyage. He said that at or about the time of the collision between the barge Ruddy and the steamer Fort Ash, which resulted in the immediate sinking of the barge, the Pentucket was about thirty to fifty feet off the black buoy, and that he was separated from the Fort Ash by a matter of thirty feet.

Again the testimony of Soderberg is helpful. He said that the Brimstone had never changed her course—"She was on the right side of the channel". This testimony is contradictory of the version of the Fort Ash witnesses who would explain the fact that the tug Brimstone was at the time of the collision on her own starboard side of the channel by reason of a sheer to the right. The matter to a considerable extent is one of credibility, and I believe that the Brimstone proceeded on the starboard side, and not along the red buoys as the Fort Ash contended.

Another fault that contributed to the happening of the collision was the Fort Ash's failure to comply with the Narrow Channel Rule, 33 U.S.C.A. § 210, in that she failed to "Keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel". The width of the channel at or about the place of collision was about seven hundred and fifty feet. In The Porchester (The Malang) 2 Cir., 94 F.2d 644, it was held that the channel in the East River at Negro Point was a narrow channel, though the width was about one thousand feet. See also The Trim, D.C., 30 F.Supp. 283, where the channel was twelve hundred feet wide.

Finally it must be observed that the speed of the Fort Ash also contributed to the happening of the accident. Soderberg, whose tug was on the port side of the Ferncliffe, which has been referred to heretofore as heading for the north channel, testified that when the Fort Ash was

overtaking the Ferncliffe she appeared to be making full speed, and kept on coming at that speed. He estimates that the Fort Ash was then making nine or ten knots. Breakey testified that he did not think that the speed, at the time of the collision, was over five or six knots an hour. The chief officer of the Fort Ash said that at 7:23 which was very shortly before the collision, the speed was about eight knots. For a minute and a half prior thereto her engines had been going astern but she was making no sternway. The most· favorable testimony that can be accorded the Fort Ash in respect to speed is that she was doing about five knots when the collision occurred.

That the Fort Ash was proceeding at an undue rate of speed in view of the circumstances which prevailed, is indicated by the force of impact, and the rapidity with which the barge sank.

In view of the foregoing, the libellant may have a decree, and the cross-libel of Hart will be dismissed.

Concurrently with this opinion, appropriate findings of fact and conclusions of law will be filed.